[Crim. No. 22406. Sept. 2, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
DOROTHY SUZANNE WICKERSHAM, Defendant and Appellant.

**COUNSEL**

Dennis P. Riordan, James Larson and Larson & Weinberg for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein and Edward P. O'Brien, Assistant Attorneys General, Herbert F. Wilkinson, W. Eric Collins and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BIRD, C. J.**—This case raises several questions concerning a trial court's duty to give instructions *sua sponte* in criminal cases. What standard should the trial court apply in determining whether to give instructions on necessarily included offenses? Did the evidence in the present case require instructions on voluntary manslaughter and second degree murder? Should the doctrine of "invited error" be invoked where the defense counsel has not articulated a deliberate tactical objection to required instructions?

I.

Appellant was convicted of first degree murder in the shooting death of her husband, Curt, who died on September 8, 1979. (Pen. Code,

§§ 187, 189.)[1] The jury also found that appellant had used a firearm within the meaning of section 12022.5.[2]

Shortly after 1:30 p.m. on September 8th, appellant telephoned the Marin County Communications Center to request emergency relief because of "a terrible accident." She then called her priest, Monsignor Keane, and asked him to come to the house. The Novato Police Department was contacted and informed that an accident had occurred at her home.

Police Sergeant Gary Barner was the first officer to arrive at the scene. He found a group of about 20 to 30 people standing in the street in front of appellant's home. Appellant, "who appeared . . . to be hysterical," approached him. "She was yelling hysterically . . . . [S]he said that her husband was in the house and had been shot." In response to the officer's question, appellant stated that she had done the shooting. She also told him that her husband was in the bedroom and the gun was at a neighbor's house.

Officer Michael Funk arrived and stayed with appellant while Sergeant Barner began to search the house. As he started up the stairs to the second floor, he saw appellant's husband's body near the wrought iron railing on the landing above. Barner determined that Curt was dead.

Two paramedics arrived soon after Officer Funk. Robert Weber, one of the paramedics, testified that the body was lying face down and the head and arms were protruding through the railing. When the body was turned over and the shirt collar removed, Weber noticed a bullet hole above the right breast.

Officer Lance McHenry arrived at the same time as the paramedics. McHenry had met appellant two months earlier when she sought police protection because of alleged threats made by Curt.

Officer McHenry testified that on September 8th, appellant "ran up to me in a hysterical-type condition" and made several statements. Some of the comments were unintelligible because of her condition. She did state that her husband had been depressed, that the shooting was an

---

[1]Unless otherwise indicated, all statutory references hereafter are to the Penal Code.
[2]The trial court struck the use finding.

accident, and that things had been going well for them. She asked several times how her husband was. At one point she told McHenry, "He went crazy, you know. I've told you before. He pulled the hammer back. We were in the bedroom. He was so depressed. He had been with the kids all day." At that point, appellant became hysterical again.

McHenry asked if anyone knew the location of the gun. Appellant pointed to a neighbor's house and said, "It's in there." She walked over to the neighbor's garage, pointed toward the back, and said, "I put it up there away from the kids." McHenry could see the gun on top of a hot-water heater.

Upon returning to the street in front of her house, appellant stated, "He was depressed. He went crazy and started towards me. His hand went into his pocket. And I know he carries a gun there. And then he pulled the hammer back." She became hysterical again and then stated, "It was an accident. I didn't have any malice."

Appellant asked McHenry if he thought she needed an attorney. He stated that she could call one if she wished. Sergeant Barner, returning from the house, advised McHenry that it would be best to take appellant to the police station. McHenry asked appellant if she wanted to go to the station with him. She agreed.

On the way to the station, appellant again asked if she needed an attorney. McHenry told her that she could call one. She then asked if she could stop by a church to pray. McHenry allowed her to do so.

Once at the station, appellant was brought into the employee lounge. When she asked to use the bathroom, McHenry told her that a female clerk would accompany her and that she could not wash her hands because a test would be performed on them. Appellant stated, "You know I fired the gun. I told you." Appellant also stated, "I didn't mean to hurt him." Again, appellant asked if she needed an attorney and was told that she could call one. Instead, she called to find out if her children were all right.

Janice Arnheiter, a friend of appellant, was then brought in to see her. Appellant told Arnheiter, "He was depressed. The gun was on the shelf and he went crazy when he saw it. He reached for it and I grabbed it. He pulled the hammer back and it went off. I was holding the gun. My finger was, you know, where it went off."

Appellant was then taken to an interview room by Officer McHenry and Lynne Wald, senior clerk at the police station. She was advised of her *Miranda*[3] rights. Appellant stated that she had kept the gun in the closet because it was the easiest place to get to if someone broke in. At one point, she stated that she did know how to use the gun, but later she stated that Curt had taught her how to shoot another weapon many years before. When informed that Curt had died, appellant asked to use the phone to break a tennis date for the following day.

Back at the house, the officers searched the premises for additional bullets, but did not find any. At the top of the stairs, near the bedroom, the officers found a blue shirt wadded up in the corner against the wall.

In a closet in the bedroom, two boxes were found, one for a revolver and one for ammunition. The boxes were barely visible behind hats and shoe boxes. Five bullets were missing from the box of ammunition.

Ervin Jindrich, the county coroner, performed the autopsy. The cause of death was determined to be a gunshot wound. Jindrich stated that the bullet entered the right chest at a point approximately five inches to the right of the midline of the body. The bullet traversed the right thoracic cavity, the space in which the lung is confined, on a generally horizontal plane. The bullet went slightly from right to left within the body. Jindrich was unable to determine the distance of the gun from the body because no powder residue was found on the skin. He further stated that Curt could have been bent over at the time of the shooting.

William Corazza, a criminalist with the California Department of Justice, examined the blue shirt and the weapon recovered from the neighbor's garage. The shirt contained bullet holes and smoke and powder residues, consistent with a bullet passing through the shirt at close range. According to the criminalist's best calculations, "the shirt was somewhat bunched above the weapon. It was not wrapped tightly around it . . . ."

Regarding the weapon, Corazza noted that the cylinder has a five-bullet capacity. Two circles of smoke residue around the opening of the chambers in the cylinder indicated that the weapon had been fired two times since its last cleaning. Corazza explained that the weapon could

---

[3]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

operate in both single and double action. In double action, it is necessary only to pull the trigger to fire the weapon. In single action, the hammer must be pulled back first, then the trigger pulled. The weapon was operable and could not accidently discharge by jarring.

Corazza stated that it would be possible to push the hammer back while facing the gun. With the gun operating in single action, only five pounds of pressure on the trigger was required to fire the weapon once the hammer was pulled back. Corazza also testified that the weapon contained two expended rounds and three live rounds, one of which was at the top of the cylinder underneath the hammer. In order to reach this configuration, it was his opinion that the weapon must have been fired twice; then, either the weapon was cocked and the hammer let down gently or it was partially cocked and the cylinder was rotated manually.

The prosecution claimed that the shooting was premeditated and deliberate murder. It alleged that appellant killed her husband because of jealousy and for financial gain.

Appellant and her husband lived in Novato and had five children. Curt worked as an investigator for the United States Customs Service. His work caused him to be away from the home quite often. Appellant had asked him to change jobs so that he could spend more time at home. When this did not happen, appellant asked Curt to move out of the house. He did so on February 12, 1979, and moved in with Frank Orrantia, another customs investigator.

Appellant filed a petition for dissolution of marriage on February 21, 1979. Soon thereafter, she contacted Attorney Richard Barry and asked him to draw up a marital settlement agreement to which she and Curt had agreed. Under the agreement, appellant received the house and its furnishings, one of their two cars, and the proceeds from the sale of the other car to pay certain debts. Curt was to receive the entire interest in federal Civil Service retirement benefits. In addition, the children would be named beneficiaries of his government life insurance policy. Curt would be obligated to pay $325 a month spousal support and $875 per month child support.

Barry told appellant that, in the event of her husband's death, her spousal support would cease. He also told her that she was giving up all claim to Curt's retirement benefits and that these benefits might be worth more than her property under the agreement. Some time before

the end of August, Barry's office received a message from appellant not to file the final judgment because she was going to have surgery and wanted the medical expenses covered by Curt's employment benefits. No final judgment was entered.

Appellant also spoke with Barry about obtaining a restraining order against her husband. She told Barry that she was afraid of her husband and he was very volatile. Although he had never hurt her, she said that he always seemed to be just on the verge of striking her. She also stated that she was afraid he would take the children and disappear with them. Appellant further stated that Curt sometimes wore a gun at the house.

Marguerite Banks, a United States Customs personnel staffing specialist, testified that Curt had a $43,000 life insurance policy with a double indemnity clause for accidental death. As a matter of course, the beneficiaries of the policy were appellant and the children. As of September 8, 1979, the policy would pay a monthly annuity to appellant of $685 and yearly benefits of $864 for each child. On October 8, 1979, one month after the shooting, claim forms were filed on appellant's behalf under the policy. An attorney presented the forms along with a letter explaining that the claim was for the children's benefits. The attorney enclosed a copy of the marital settlement agreement.

After Curt moved out of the Novato home, he began dating Mary Ann Steinbeck. Sometime around May, they began living together. According to Steinbeck, Curt was relieved when the divorce proceedings started. He was expecting to get a promotion and a new job in Washington, D.C. and Steinbeck testified that she was planning to move with him. She denied she ever saw him wear a gun and stated that on September 8, he was wearing tight pants and was not carrying a gun.

Several witnesses testified that appellant made frantic efforts to meet Steinbeck. Richard Warner, a customs criminal investigator, testified that appellant questioned him about Steinbeck's background and where she worked. He further stated that Curt seemed happy and was looking forward to his transfer to Washington.

Marie Mouchka, a friend of appellant, testified that appellant was trying desperately to find Steinbeck. Appellant called Mouchka many times to report on the progress of her search. Once appellant stated that

she was going to go to Fresno because she had heard that Steinbeck worked there. On different occasions, appellant had the operator interrupt Mouchka's phone conversations with emergency messages. When appellant got on the line, she would relay some information about the divorce proceedings or her finances.

Frank Orrántia, a colleague of Curt, also reported numerous conversations with appellant. He testified that appellant told him several times that Curt appeared depressed and that she was afraid he might commit suicide. She also asked him about Steinbeck. On May 14, Orrantia's phone conversation with his ex-wife was interrupted by the operator who stated that appellant wanted to talk to him because of an emergency. Appellant told Orrantia that Curt had threatened her and that she had called the police. Orrantia spoke with Curt and then called appellant. He told her that he did not think Curt had threatened her. At that point, appellant appeared to get upset with him and said that Curt had made threats in the past.

On July 10th, appellant called the Novato Police Department to request an officer. Officer McHenry responded. Appellant told him that Curt had been threatening her since the separation and that he had called her several times drunk or enraged. She stated that on one occasion Curt had taken a gun out of his pocket and exposed it in a threatening manner. Since Curt was coming over later that day, she wanted an officer present. McHenry advised her to keep the doors locked and said that if Curt came, she could call the police department and an officer would be sent to her home. Appellant also asked the officer if she should purchase a gun. He advised her not to, especially if she did not know how to use one.

On Mother's Day, appellant called Ms. Mouchka, who worked as a nurse at the Suicide Prevention Center. According to Mouchka, appellant said that Curt had ruined the day by coming late for dinner. He was still at the house and appellant wanted to know how many Valiums it would take to harm someone. Mouchka laughingly said, "My God, Suzanna, you're going to kill him." Appellant replied, "No. I just want to give him enough for him to tell me the truth who that woman is." When appellant said that she was crushing the Valiums in wine, Mouchka told her that was a lethal combination. Appellant responded, "Oh, don't be overly dramatic." Appellant called back later to say that Curt had refused the wine because it tasted bitter.

Mouchka also reported a conversation with appellant which she thought took place in August. To Mouchka's comment that appellant had to face the fact that the divorce was going forward, appellant replied that Curt wanted to pick up the final divorce papers but he was not going to. Appellant stated that she was not going to be divorced.

Joe Stavish, a carpenter, was hired to do some work on appellant's house in May. He stated that he became sexually involved with her a few weeks after he was hired. The relationship lasted for several weeks. Stavish testified that he had about six conversations with appellant about killing her husband. He stated that she offered him $5,000 to kill Curt. Appellant suggested various means of accomplishing the task, including shooting him in an underground garage while he was at work in Hawaii. Appellant allegedly stated that she would get more money if Curt were killed while on duty. Stavish rejected her offer and demanded $10,000, which she said was too much. He also pointed out to her better ways of killing Curt than she had suggested. Stavish finally got tired of hearing her talk about the subject and told her to stop the conversations. Appellant replied that she would kill Curt herself. Stavish advised her to stand close to Curt and fire the weapon quickly.

Stavish also reported that appellant told him about the Valium incident. She said that she had put Valium in Curt's wine either to try to kill him or to put him to sleep. He could not recall which of these motives she had expressed.

According to Stavish's trial testimony, he came by appellant's home on September 2d, to see if she had finished a particular project. She told him that Curt was such a miserable person that she would be doing him a favor to put him out of his misery. Stavish conceded that he had not mentioned this statement at the preliminary hearing.

Stavish testified that he had talked to appellant about his plans for killing his father when he was younger. From the age of 14 to 17, Stavish seriously contemplated killing his father by various means. Stavish also stated that during about half of his conversations with appellant he was under the influence of marijuana or liquor. He stated that he participated in the conversations to allow appellant to let off steam. He thought that she was fantasizing. As for her demeanor, "[s]he'd get really upset and then she'd freeze and get like in a catatonic state where she'd be like motionless, but obviously very, very upset .... She

couldn't talk. And she'd get really upset. Her voice would just choke off completely."

Paulette Baccioco met appellant in 1978 at Dominican College. Appellant complained to Baccioco about her financial problems after her separation from Curt. According to Baccioco, appellant refused to get a job and stated to Baccioco that if she killed her husband, her financial problems would be solved. From March through June, appellant discussed killing Curt "frequently." Appellant mentioned that she would receive a little less than $100,000 from the insurance coverage if Curt died.

Baccioco also testified about a telephone call from appellant in which she stated that she was trying to give Curt the wine with Valium. She asked Baccioco how she could get Curt to drink it. Baccioco refused to help.

Finally, appellant told Baccioco that Stavish would not help her kill Curt. According to the witness, appellant stated, "You are so bright, you can help me figure out a way to kill my husband." On cross-examination, Baccioco admitted that she had forgotten about these conversations until reminded after Curt's death by a friend to whom she had repeated the discussions.

Pat Libby testified that the day before the shooting appellant said Curt was coming over to the house the next day. According to Libby, appellant told her "that if she got through tomorrow, everything would be okay." After Curt died, appellant told Libby that Curt's death was probably for the best because he had stopped seeing the children while he was alive.

Rae Ellen Mercer, a marriage counselor, saw the Wickershams singly and together on several occasions from March to June. Appellant told Mercer that she did not want a divorce and wanted Curt to come back. She also told Mercer about an incident in which she found a gun in Curt's car. She stated that she did not know what she meant to do when she had the gun in her hand. According to Mercer, appellant was emotional, occasionally hysterical.

Anna Satenstein performed a "spiritual reading" for appellant on April 21st. Appellant returned on April 30th when Curt was meeting

with Mercer and asked Satenstein to tell her what was occurring at that meeting. Satenstein refused.

Appellant testified in her own defense. She said that Curt occasionally carried a gun in his waistband if he was called out at night. Although Curt had never hit her, she thought he had the potential to do so, based on violent acts he had performed as a police officer during the Watts riots and as a soldier in Korea. Appellant denied trying to locate Steinbeck. She further stated that she knew she had waived all rights to Curt's insurance and retirement benefits. She stated that she had not asked her attorney to delay the dissolution proceedings. She denied making the various threatening statements related by Stavish, Baccioco, and Mouchka and the postmortem statement related by Libby. Regarding Stavish, she said that he had first brought up the subject of killing Curt by offering to do it for $10,000. Appellant rejected the suggestion immediately. She also stated that Stavish had stolen lumber from her.

Appellant claimed that she had put only five milligrams of Valium in Curt's wine and did so simply to calm him down when he was upset. Concerning the incident involving the gun in the glove compartment, appellant testified that she had opened the glove compartment to take out some maps and a first-aid kit. The gun was on top of those items and had to be removed in order to retrieve them. When Curt, who was approaching the driver's side of the car, saw the gun, he became scared and acted "erratic." According to appellant, Curt attempted to "struggle with that gun." Appellant told him that he should not have a gun in the car with the children present.

Appellant testified about another incident in which her car twice ran into Curt's, once from the rear and once from the front. She ascribed the incident to inattention, although she admitted being frustrated and upset that day because she had told him to collect his things and leave for good. This was the last time she saw him before September 8th.

On July 5, 1979, appellant purchased the weapon which was involved in the shooting. She testified that she bought the gun to protect her home and that there had always been a gun in the house for protection.

Concerning the day of the shooting, appellant stated that Curt came to the house about 10:30 a.m. They were on friendly terms, and Curt made some minor house repairs before taking the children to lunch. Appellant began gathering Curt's things for him. When Curt came back,

they began to pack some of his shirts which were in a closet in which the gun was kept. When appellant began removing Curt's shirts from the closet, he saw the gun and asked, "What's that gun?" with a "slight bit of alarm in his voice." Appellant answered, "It's mine." With her back to Curt, appellant "sensed he was moving towards me." Afraid that he would take the gun, she scooped the weapon up with five or six shirts. When she turned back, Curt reached to get the gun. There was a short scuffle and the gun went off. After the shot, Curt reached behind him. Thinking that he had a gun, appellant left the room and took her son, who was standing in the doorway. She did not return to the room, but placed the gun in the neighbor's garage and made the emergency phone calls. Appellant denied intending to fire the weapon or to kill her husband.

Janice Arnheiter, who had hired Stavish to do carpentry work, testified that he was not believable. In addition, he told her that he had discussed his testimony with Baccioco.

Various witnesses testified concerning appellant's reputation for honesty and nonviolence. These witnesses included a San Francisco police captain, her priest, and her psychiatrist.

Before final argument to the jury, the court discussed the instructions with both counsel. The discussion was as follows:

"THE COURT: [CALJIC No. 5.00] was requested concerning excusable homicide, lawful act. I believe the District Attorney asked for that.

"You have no objection to that, I assume?

"[Defense Counsel]: No, I do not.

"THE COURT: And, last, the Defendant did request the lesser-included instructions, particularly 17.10, the introductory, and the involuntary manslaughter instructions, 8.45, 8.46, and 3.32.

"Is that what your request is?

"[Defense Counsel]: Yes, your Honor.

"THE COURT: I'll also give the jury the instruction concerning the use of a firearm.

"[Defense Counsel]: The Defendant does object to that on the ground that it's, with respect to first-degree murder, it's immaterial. A finding is ineffective.

"And, secondly, with respect to the crime of involuntary manslaughter, by its very definition, the crime would exclude use of a gun in the sense of using a gun instead of accidentally firing it.

"THE COURT: Okay. I'll give 17.19, the use instruction, nevertheless, together with a verdict form for the jury in the event they find the Defendant guilty of either murder or involuntary manslaughter.

"I'll give them the verdict form for the use of the firearm over the Defendant's objection."

The court thereupon instructed the jury on excusable homicide (CALJIC No. 5.00), the definitions of murder (CALJIC No. 8.10 (1979 rev.)) and malice aforethought (CALJIC No. 8.11 (1979 rev.)), first degree premeditated and deliberate murder (CALJIC No. 8.20 (1979 rev.)), and involuntary manslaughter as a necessarily included offense (CALJIC Nos. 17.10, 8.45 (1979 rev.), 8.46, 3.32, 8.74 (1976 rev.), and 8.72).

## II.

Appellant contends that the trial court erred in not instructing *sua sponte* on second degree murder and voluntary manslaughter.

The trial court functions both as a neutral arbiter between two contesting parties and as the jury's guide to the law. This role requires that the court fully instruct the jury on the law applicable to each particular case. ■ "'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' (*People v. St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].) That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present (see, e.g., *People v. Hood* (1969) 1 Cal.3d 444 [82 Cal.Rptr. 618, 462 P.2d 370]), but not when

there is no evidence that the offense was less than that charged. (*People v. Noah* (1971) 5 Cal.3d 469, 479 [96 Cal.Rptr. 441, 487 P.2d 1009]; *People v. Osuna* (1969) 70 Cal.2d 759, 767 [76 Cal.Rptr. 462, 452 P.2d 678].)" (*People v. Sedeno* (1974) 10 Cal.3d 703, 715-716 [112 Cal.Rptr. 1, 518 P.2d 913].)

The fulfillment of this obligation ensures that the jury will consider the full range of possible verdicts—not limited by the strategy, ignorance, or mistakes of the parties. The jury should not be constrained by the fact that the prosecution and defense have chosen to focus on certain theories. "Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense. (*People v. St. Martin, supra*, 1 Cal.3d 524, 533.)" (*Sedeno, supra*, 10 Cal.3d at p. 716.) Furthermore, where counsel is not aware of alternative verdicts or incorrectly believes them to be irrelevant to the case, the trial court's action will avoid an unwarranted all-or-nothing choice for the jury and will ensure that the verdict is no harsher or more lenient than the evidence merits. These policies reflect concern both for the rights of persons accused of crimes and for the overall administration of justice.

In *Sedeno, supra*, 10 Cal.3d at page 716, this court stated that the trial court was obligated to instruct on necessarily included offenses and to give requested instructions "whenever there is 'any evidence deserving of any consideration whatsoever ....'" (Citing *People v. Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281].) In *People v. Flannel* (1979) 25 Cal.3d 668, 684-685, footnote 12 [160 Cal.Rptr. 84, 603 P.2d 1], the lead opinion disapproved the suggestion that "jury instructions must be given whenever *any* evidence is presented, no matter how weak" in the context of requested instructions on diminished capacity. (Italics in original.) The lead opinion stated that the court need only give the instruction if the accused proffers evidence sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable men could have concluded'" that the particular facts underlying the instruction did exist. (At p. 684, quoting from *People v. Carr* (1972) 8 Cal.3d 287, 294 [104 Cal.Rptr. 705, 502 P.2d 513].)

This does not require—or permit—the trial court to determine the credibility of witnesses. It simply frees the court from any obligation to present theories to the jury which the jury could not reasonably find to

exist. Thus, in *Flannel*, the mere fact that the accused had "consumed relatively small amounts of alcohol over a long period of time" (25 Cal.3d at p. 685) did not warrant giving an instruction on diminished capacity.

*Flannel* did not directly discuss the standard to be utilized in determining when the court has a duty to instruct *sua sponte* on necessarily included offenses. However, logic would seem to require that the same standard should generally apply.[4] ■ The trial court is not obligated to instruct *sua sponte* on necessarily included offenses unless the evidence would justify a conviction of such offenses. (See *People v. Ramos* (1982) 30 Cal.3d 553, 582 [180 Cal.Rptr. 266, 639 P.2d 908].) This rule ensures that the jury's attention is properly focused on the relevant legal theories.

In *Sedeno*, this court distinguished voluntary manslaughter due to heat of passion from other necessarily included offenses for purposes of the duty to instruct *sua sponte*. ■ Normally, an intentional killing is at least second degree murder, but such a killing is voluntary manslaughter if "shown to have been committed in a heat of passion upon sufficient provocation .... [¶] However, unless it appears from the prosecution's case that the killing was committed in the heat of passion and upon sufficient provocation the burden is on the defendant to raise a reasonable doubt in the minds of the jurors that malice was present. [Citation.]" (10 Cal.3d at p. 719.) Therefore, "[b]efore a court must instruct *sua sponte* on voluntary manslaughter in the heat of passion as a lesser offense included within murder there must be either some evidence that heat of passion was present at the time of the killing or some reason for the court to know that the defendant is relying on that theory of manslaughter as a defense." (*Ibid.*)

This standard is compatible with that promulgated in *Flannel*. (4) The trial court need not instruct *sua sponte* on voluntary manslaughter due to heat of passion unless there is evidence sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable men could have concluded'" that the accused acted intentionally but without malice. (*Flannel, supra*, 25 Cal.3d at p. 684.) Once there is sufficient evidence to warrant this conclusion, the trial court is obligated to instruct on the theory.

---

[4]Indeed, *People v. Cantrell* (1973) 8 Cal.3d 672, 685 [105 Cal.Rptr. 792, 504 P.2d 1256], one of the cases disapproved by *Flannel*, concerned *sua sponte* duties. (*Flannel, supra*, 25 Cal.3d at pp. 684-685, fn. 12.)

Regarding defenses, *Sedeno* held that "the duty to give instructions, *sua sponte*, on particular defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case. Indeed, this limitation on the duty of the trial court is necessary not only because it would be unduly burdensome to require more of trial judges, but also because of the potential prejudice to defendants if instructions were given on defenses inconsistent with the theory relied upon." (*Sedeno, supra*, 10 Cal.3d at p. 716.)

Having delineated the applicable standards, this court must next decide whether the evidence at trial required *sua sponte* instructions on second degree murder and voluntary manslaughter. These crimes, of course, are offenses necessarily included within first degree murder.

█ Appellant advances two possible theories of voluntary manslaughter—heat of passion and unreasonable self-defense. █ In *People* v. *Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777], this court quoted *People* v. *Valentine* (1946) 28 Cal.2d 121, 139 [169 P.2d 1] regarding the appropriate instructions to be given the jury upon a claim of voluntary manslaughter due to heat of passion: "'The jury is . . . to be admonished and advised by the court that this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances, and that, consequently, no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man. . . . For the fundamental of the inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and never, of course, the passion for revenge—to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'"

█ To satisfy the objective or "reasonable person" element of this form of voluntary manslaughter, the accused's heat of passion must be due to "sufficient provocation." (*Sedeno, supra*, 10 Cal.3d at p. 719.) However, as this court stated in *Berry*, "there is no specific type of provocation required by section 192[5] and . . . verbal provocation may be sufficient." (18 Cal.3d at p. 515.)

---

[5]Section 192 defines manslaughter.

The subjective element requires that the actor be under the actual influence of a strong passion at the time of the homicide. "In *People* v. *Borchers* (1958) 50 Cal.2d 321, 329 [325 P.2d 97] in the course of explaining the phrase 'heat of passion' used in the statute defining manslaughter we pointed out that 'passion' need not mean 'rage' or 'anger' but may be any '[v]iolent, intense, high-wrought or enthusiastic emotion' and concluded there 'that defendant was aroused to a heat of "passion" by a series of events over a considerable period of time . . . .' (50 Cal.2d at p. 328, 329.)" (*Berry, supra,* 18 Cal.3d at p. 515.) However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter—"the assailant must act under the smart of that sudden quarrel or heat of passion." (CALJIC No. 8.42 (1979 rev.).)

█ In the present case, there is certainly substantial evidence of intense emotion. Two police officers who observed appellant shortly after the shooting described her as "hysterical." Many of her statements at that time were unintelligible. In addition, several witnesses testified that appellant was very distraught over Curt's involvement with Mary Ann Steinbeck.

However, there is virtually no evidence of provocation, even under a view of the evidence most favorable to appellant. Appellant testified that she and Curt were in the bedroom for approximately 10 minutes before the fatal incident. They were getting his things together, going through old photographs, and reminiscing. She described him as "very nostalgic." The last thing he asked her was, "Do you think there's any hope we'd ever get back together?" She answered, "No."

The only possible source of provocation was the victim's grabbing of the gun. Appellant testified that she struggled with Curt for possession of the gun and implied that she was afraid he would use the gun if he obtained possession. Given the background of reported threats by the victim, the jury could have found that a reasonable person in appellant's position, faced with an attack of this nature, would have been overcome by fear and acted to repel the attacker.

This theory of voluntary manslaughter, however, would meet all the requirements of reasonable self-defense. The Legislature has deemed such self-defense to be justifiable homicide rather than voluntary manslaughter. (§ 197.) Hence, a trial court should not instruct on heat-of-

passion voluntary manslaughter where the same facts would give rise to a finding of reasonable self-defense.[6] (See *Flannel, supra,* 25 Cal.3d at p. 678; *People v. Mitchell* (1939) 14 Cal.2d 237, 241-242 [93 P.2d 121]; *People v. Manzo* (1937) 9 Cal.2d 594, 598-599 [72 P.2d 119].)

Whether or not the evidence warranted an instruction on heat of passion, the alternative theory of unreasonable self-defense was certainly raised by the facts. ▮ "An honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter." (*People v. Flannel, supra,* 25 Cal.3d at p. 674, italics omitted.) ▮ Based on appellant's testimony, the jury could have found that (1) she picked up the gun only after her husband had noticed it and because she divined that he was coming over to take it; (2) he grabbed for the gun and attempted to take it from her; (3) she recalled at that moment a previous incident in which he had fought her for possession of a gun. Other evidence established that appellant had reported threats on her life made by her husband. Furthermore, certain of appellant's statements following the shooting lend support to this theory.[7] Given these facts, the jury could have found that appellant honestly believed that her life was in danger and had acted in accordance with that belief.

This scenario is consistent with appellant's testimony except for the cause of the gun being fired. The "unreasonable self-defense" type of voluntary manslaughter is premised on an intentional killing, whereas appellant testified that the gun went off by accident in the midst of the struggle. This, however, does not preclude a jury determination that in fact appellant pulled the trigger out of fear. The jury was entitled to reject that portion of appellant's testimony which sought to explain the shooting as an accident and still find that appellant had not acted with malice. (See *People v. Shavers* (1969) 269 Cal.App.2d 886, 889 [75 Cal.Rptr. 334].)

Hence, the evidence was sufficient to justify a finding of unreasonable self-defense and the trial court would have erred had it denied a request for instructions on this theory. (See *People v. Dewberry* (1959)

---

[6]Appellant does not contend that the trial court was under an obligation to instruct *sua sponte* on reasonable self-defense.

[7]"He went crazy and started towards me. His hand went into his pocket. And I know he carries a gun there." "The gun was on the shelf and he went crazy when he saw it. He reached for it and I grabbed it."

51 Cal.2d 548, 557 [334 P.2d 852].) However, unreasonable self-defense comes within *Sedeno*'s category of "defenses" for purposes of the obligation to instruct *sua sponte*. As noted above, the trial court need only instruct on a particular defense "if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*Sedeno, supra*, 10 Cal.3d at p. 716.)

In the present case, appellant testified that the shooting was an accident and that she did not intend to kill her husband. It is clear from the record that appellant was not relying on unreasonable self-defense and that this theory was inconsistent with her proffered defense. Thus, the trial court was under no obligation to instruct on unreasonable self-defense in the absence of a specific request by counsel. (See *Sedeno, supra*, 10 Cal.3d at pp. 717-718.)

■ Appellant further argues that instructions on second degree murder should have been given. ■ "[T]he existence of provocation which is not 'adequate' to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation." (*People* v. *Valentine, supra*, 28 Cal.2d at p. 132; see also CALJIC No. 8.73 (1979) rev.).) Thus, where the evidence of provocation would justify a jury determination that the accused had formed the intent to kill as a direct response to the provocation and had acted immediately, the trial court is required to give instructions on second degree murder under this theory. The fact that heated words were exchanged or a physical struggle took place between the victim and the accused before the fatality may be sufficient to raise a reasonable doubt in the minds of the jurors regarding whether the accused planned the killing in advance.

■ In the present case, there was such evidence. The jury could have found that appellant did not form the intent to kill her husband until after he had mentioned the gun, come toward her, and tried to grab it from her. Even if the jury found that there was not sufficient provocation to warrant a lethal response and that appellant was not truly in fear for her life, the jury could have concluded that these activities affected her decision to kill Curt and that she had not premeditated or deliberated.

Indeed, an instruction on second degree murder would have been required even in the absence of appellant's testimony regarding Curt's behavior. Although the evidence was sufficient to justify a finding of deliberation and premeditation, such a finding was not compelled. The jury could have found that appellant did not premeditate but rather acted upon a "sudden and unconsidered impulse[]." (*People* v. *Fields* (1950) 99 Cal.App.2d 10, 13 [221 P.2d 190].) Hence, even if the jury rejected her testimony, that rejection did not require a conviction for first degree murder. Unlike certain felony-murder situations (see § 189), this is not a case in which appellant was either guilty of first degree murder or innocent of any charge.

Thus, the trial court erred in not instructing *sua sponte* on second degree murder. There was sufficient evidence to warrant jury consideration of this alternative verdict.

Respondent contends that any error in this regard was invited by defense counsel. It is argued that, even if the trial court was required by the evidence to give instructions on necessarily included offenses, reversal is not required because "defense counsel, intentionally, and for tactical purposes, chose to limit the lesser included offenses to involuntary manslaughter."

The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. However, because the trial court is charged with instructing the jury correctly,[8] it must be clear from the record that defense counsel made an express objection to the relevant instructions. In addition, because important rights of the accused are at stake, it also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.

The seminal case concerning invited error is *People* v. *Graham* (1969) 71 Cal.2d 303 [78 Cal.Rptr. 217, 455 P.2d 153]. There, this court found error in the trial court's failure to instruct on voluntary and involuntary manslaughter due to diminished capacity.[9]

---

[8]"The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. [Citations.]" (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 716.)

[9]The trial court instructed the jury that diminished capacity could negate malice and that it could return a verdict of voluntary manslaughter, but it did not connect dimin-

The Attorney General argued in that case that any error in the homicide instructions was invited by counsel. As the *Graham* opinion relates, "The trial court formulated many instructions 'on the record.' At one point the court inquired whether a combination of its proposed homicide instructions satisfied the attorneys. The court said, 'As I understand, everyone agrees that there is no evidence from which involuntary manslaughter could be found; the only type of manslaughter that could be found here would be voluntary.' The court read its proposed voluntary manslaughter instruction. It then stated, 'That combination of instructions would probably instruct the jury as to the law that's. . . .' All three defense counsel interrupted the judge and stated, 'That's agreeable.'" (*Id.*, at p. 317.)

This court noted that the question posed was whether "the trial court's affirmative duty to instruct the jury on its own motion on the general principles of law relevant to the issues of the case can be nullified by waiver of defense counsel." (*Id.*, at pp. 317-318.) In *People v. Phillips* (1966) 64 Cal.2d 574 [51 Cal.Rptr. 225, 414 P.2d 353], the court had found such "invited error" where defense counsel strongly opposed certain instructions for specific tactical reasons. (*Id.*, at pp. 580-581, fn. 4.) According to *Graham*, the rule derived from *Phillips* is "that the court's responsibility could be negated only in that special situation in which the defense counsel deliberately and expressly, as a matter of trial tactics, objected to the rendition of an instruction." (*Graham, supra*, 71 Cal.2d at p. 318.)

Such a rule, *Graham* stated, was required by statutes concerning the scope of appellate review of instructions. Former sections 1259 and 1469 both provided that "'an appellate court may review an instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby.'"[10] (*Graham, supra*, 71 Cal.2d at p. 319.)

 This rule is necessary to ensure that an accused's right to complete instructions is fully protected. "As the court forcefully stated in

---

ished capacity to the lesser included offense. (*Id.*, at pp. 314-315.) The court gave no instructions on involuntary manslaughter due to unconsciousness from intoxication.

[10]Section 1259 currently states, in relevant part, "The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." Section 1469 states, in relevant part, "The [appellate] court may also review any instruction given, refused or modified, even though no objection was made thereto in the trial court if the substantial rights of the defendant were affected thereby."

*People* v. *Keelin* (1955) 136 Cal.App.2d 860, 874 [289 P.2d 520, 56 A.L.R.2d 355], 'Nevertheless, error is nonetheless error and is no less operative on deliberations of the jury because the erroneous instruction may have been requested by counsel for the defense. After all, it is the life and liberty of the defendant in a case such as this that is at hazard in the trial and there is a continuing duty upon the part of the trial court to see to it that the jury are properly instructed upon all matters pertinent to their decision of the cause.' Accordingly, if defense counsel suggests or accedes to the erroneous instruction because of neglect or mistake we do not find 'invited error'; only if counsel expresses a deliberate tactical purpose in suggesting, resisting, or acceding to an instruction, do we deem it to nullify the trial court's obligation to instruct in the cause." (*Id.*, at p. 319.)

The *Graham* court found no invited error regarding the omitted manslaughter instructions. Counsel never expressed a tactical objection to an instruction on involuntary manslaughter. Rather, the record indicated a strategy of offering the jury as many different verdicts as possible. (*Id.*, at p. 320.) Counsel's acceptance of an instruction on voluntary manslaughter which did not refer explicitly to diminished capacity "could not have been" invited. (*Id.*, at p. 321.) In any event, the trial court went on to instruct on the statutory definition of voluntary manslaughter, thus implicitly removing consideration of the defense of diminished capacity from the jury. (*Id.*, at pp. 321-322.)

In *People* v. *Mosher* (1969) 1 Cal.3d 379 [82 Cal.Rptr. 379, 461 P.2d 659], a trial court again failed to give certain required instructions on voluntary manslaughter and involuntary manslaughter due to diminished capacity. This court found there was no invited error, since "[d]efense counsel did not express a deliberate tactical purpose in suggesting, resisting, or acceding to the erroneous instruction. [Citation.]" (*Id.*, at p. 393.)

Even where counsel has suggested an erroneous instruction, the doctrine of invited error is not invoked unless counsel articulated a tactical basis for the choice. (See *People* v. *Watts* (1976) 59 Cal.App.3d 80, 85-86, fn. 2 [79 Cal.Rptr. 409]; *People* v. *Williams* (1971) 22 Cal. App.3d 34, 58 [99 Cal.Rptr. 103] ["Obviously, defense counsel's request and agreement were not tactical ploys, the engagement in which would invoke the doctrine of invited error."]; *People* v. *Aikin* (1971) 19 Cal.App.3d 685, 702 [97 Cal.Rptr. 251].) Those cases in which invited

error has been found are reported in *Graham, supra*, 71 Cal.2d at page 318 and include just such explicit statements.

Under the *Graham* rule, counsel must express a deliberate tactical purpose in objecting to a particular instruction before the failure to give that instruction will be deemed invited error. It is clear that no such objection occurred in this case. The trial court which has the duty to instruct on applicable necessarily included offenses, never asked counsel for an opinion on second degree murder.[11] The court simply noted that appellant had requested instructions on involuntary manslaughter and asked, "Is that what your request is?" Defense counsel answered, "Yes, your Honor."

Needless to say, the absence of a request is not equivalent to an express tactical objection. If counsel's failure to request a particular instruction were deemed sufficient to satisfy the invited error rule, the pivotal role and duty of the trial court would be rendered meaningless. Furthermore, defendants would suffer greatly from the mistakes and ignorance of their counsel, even though the trial court could have acted to prevent injustice. Applying the *Graham* rule to the present case, it is clear that counsel did not make an express tactical objection to the required instructions.

Respondent, however, argues that as long as the reviewing court can infer from the record as a whole that defense counsel made a deliberate tactical decision not to request instructions on necessarily included offenses, the trial court's error should be deemed invited. Respondent refers to a statement in *People v. Tidwell* (1970) 3 Cal.3d 82, 87 [89 Cal.Rptr. 58, 473 P.2d 762], that "[i]n the absence of *anything in the*

---

[11]"We deem it appropriate to emphasize that the duty of counsel to a criminal defendant includes careful preparation of and request for all instructions which in his judgment are necessary to explain all of the legal theories upon which his defense rests. If it appears to the court, however, that there is substantial evidence that would support a defense inconsistent with that advanced by a defendant, the court should ascertain from the defendant whether he wishes instructions on the alternative theory. Such inquiry will afford assurance that the theory has not been inadvertently overlooked by counsel. (Cf. *People v. Hood, supra*, 1 Cal.3d at p. 449; *People v. Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116].)

"When the charged offense is one that is divided into degrees or encompasses lesser offenses, and there is evidence from which the jury could conclude that the lesser offense had been committed, the court must instruct on the alternate theory even if it is inconsistent with the defense elected by the defendant under the rule obliging the court to instruct on lesser included offenses discussed *supra*." (*Sedeno, supra*, 10 Cal.3d at p. 717, fn. 7.)

*record* disclosing that counsel had 'a deliberate tactical purpose in suggesting, resisting, or acceding to an instruction,' we must assume that counsel merely failed to request the additional instructions because of neglect or mistake, which would be insufficient to nullify the trial court's obligation to properly instruct the jury on all the issues presented in that case." (Italics added.)

It is clear that this passage simply states a conclusion about the facts of *Tidwell* and does not constitute a modification of the *Graham* standard. If the test for invited error is whether "anything in the record" suggests a deliberate tactical purpose in failing to request a particular instruction, then invited error would be found wherever the accused had a tactical reason not to seek a necessarily included instruction. Since there is always a tactical reason not to want a necessarily included offense as an alternative—namely, to force the jury to an all-or-nothing choice—all situations would fit under that rule. In effect, the rule would require the exact opposite of *Graham*, i.e., an express statement that counsel is *not* opposed to necessarily included offense instructions for tactical reasons. Clearly, such a statement is not necessary in order to trigger the trial court's *sua sponte* duty.

Furthermore, reviewing each record to determine why counsel was silent would not only be extremely difficult, but would call for delphic powers. How can a reviewing court decide if counsel's action or lack of it is founded on strategy, ignorance, mistake, or trust?

The present case graphically reveals the inherent difficulty of such an undertaking. Counsel may have believed that it was in his client's interest to give the jury three choices—first degree murder, involuntary manslaughter, or a not guilty verdict. Alternatively, counsel may not have been aware of the possible theory for a second degree murder conviction. Finally, counsel may have believed that the trial court would give the correct instructions and either failed to notice the omission or accepted the court's action as a decision that instructions on second degree murder were not required by the evidence. From the record before this court, it is impossible to tell which of these scenarios is correct.

Even if this court were able to conclude that counsel had remained silent because of a tactical decision, invited error would not be found. Since the trial court's duty to instruct fully on the relevant legal theories is not dependent upon counsel, error in omitting required instructions cannot be waived by a party simply by the failure of its counsel to

demand the instructions. The issue centers on whether counsel deliberately caused the court to fail to fully instruct, not whether counsel subjectively desired a certain result. The error, in other words, must be "invited."

"Our courts are not gambling halls but forums for the discovery of truth." (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 533 [83 Cal.Rptr. 166, 463 P.2d 390].) It is the obligation of trial counsel to assist the court in presenting all relevant instructions to the jury. At the same time, it is the trial court which bears the ultimate responsibility for properly instructing the jury. Since there was no express tactical objection made by counsel in the present case, the trial court's error in failing to instruct on second degree murder cannot be found to have been "invited."

██ The failure to instruct on all necessarily included offenses deprives a defendant of the "constitutional right to have the jury determine every material issue presented by the evidence." (*People* v. *Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33]; see also *People* v. *Mosher, supra*, 1 Cal.3d at p. 391.) "[S]uch error cannot be cured by weighing the evidence and finding it not reasonably probable that a correctly instructed jury would have convicted the defendant of the lesser included offense." (*Sedeno, supra*, 10 Cal.3d at p. 720, citing *Modesto, supra*, 59 Cal.2d at p. 730.) However, this court held in *Sedeno* that "in some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury." (*Sedeno, supra*, 10 Cal.3d at p. 721.)

In *Sedeno*, the trial court erred in failing to give an instruction *sua sponte* on involuntary manslaughter due to diminished capacity. (10 Cal.3d at p. 720.) Such an instruction would have required the jury to specifically determine whether the accused had acted without an intent to kill and malice. The error was harmless as to the question of the intent to kill because the jury had received instructions on second degree murder without an intent to kill and had specifically and necessarily re-

jected that theory by returning a verdict of first degree murder. (*Id.*, at p. 721.) However, the error was not harmless, as to the question of malice, since instructions on felony murder had removed this issue from the jury's consideration. Thus, the jury did not necessarily reject a theory that the accused lacked malice. (*Ibid.*)

In the present case, no instruction presented the jury with a theory of intentional homicide which was not premeditated and deliberate. Once the jury found that the killing was intentional, it had no choice but to return a verdict of first degree murder. Hence, "the factual question posed by the omitted instruction"—whether appellant had acted with malice and intent, but without premeditation and deliberation—was not "necessarily resolved adversely to the defendant under other, properly given instructions." (*Sedeno, supra*, 10 Cal.3d at p. 721.) Since the jury was not required to decide specifically whether appellant had committed an intentional but nonpremeditated, nondeliberate murder, the trial court's error in failing to instruct on second degree murder cannot be deemed to be harmless. The judgment must be reversed.[12]

## III.

The trial court erred by failing to instruct *sua sponte* on second degree murder. Given the evidence in this case, the jury could have found that appellant did not premeditate and deliberate. The error was not invited inasmuch as trial counsel did not make an express tactical objection to the required instructions. Nor was the error harmless within the meaning of *Sedeno*, because no other instruction presented the jury with a theory of intentional and malicious homicide lacking premeditation and deliberation.

The judgment is reversed.

Mosk, J., Newman, J., Kaus, J., Broussard, J., and Reynoso, J., concurred.

**RICHARDSON, J.**—I concur in the judgment, under the compulsion of *People* v. *Graham* (1969) 71 Cal.2d 303 [78 Cal.Rptr. 217, 455 P.2d 153]. But for *Graham* and its progeny, we might well conclude that de-

[12]Because the judgment must be reversed, the court does not consider the other issues raised by appellant.

fense counsel's failure to request instructions on second degree murder was a deliberate, tactical decision, constituting invited error which would cure the trial court's omission to give those instructions *sua sponte.* The record appears to support a finding that the defense counsel deliberately narrowed the jury's choice of verdicts to first degree murder, involuntary manslaughter, and excusable homicide.

Yet *Graham* requires that the record reveal that counsel actually "*expresse[d]* a deliberate tactical purpose in suggesting, resisting, or acceding to an instruction .... " (P. 319, italics added.) As the majority correctly states, defense counsel herein *expressed* to the trial court no tactical purpose in foregoing instructions on second degree murder. Accordingly, under *Graham*, no basis exists for finding invited error.

In my view, the *Graham* rule should be reconsidered and possibly discarded in favor of a rule which would permit a finding of invited error based upon reasonable inferences drawn from the record. (See *People* v. *Tidwell* (1970) 3 Cal.3d 82, 87 [89 Cal.Rptr. 58, 473 P.2d 762].) Lacking majority support for reconsideration of *Graham*, however, I concur in the judgment under its compulsion.

Respondent's petition for a rehearing was denied October 21, 1982. Richardson, J., was of the opinion that the petition should be granted.