Filed 8/25/15  P. v. Strauter CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>DANTE RODNEY STRAUTER,<br><br>          Defendant and Appellant. | A140951<br><br>(San Mateo County<br>Super. Ct. No. SC069471) |

Defendant Dante Rodney Strauter appeals his conviction for voluntary manslaughter, arguing the trial court erred in denying his request for the jury to be instructed on involuntary manslaughter.  We affirm.

## I.
## BACKGROUND

On August 12, 2009, Strauter shot and killed JT Long[1] after a confrontation at JT's residence on Ralmar Avenue in East Palo Alto.  Earlier that day, JT had asked Colina Williams, Strauter's cousin, to move her car, which was apparently blocking JT's driveway.  The request triggered a violent argument.  According to Colina, JT threw a bottle at her, leaving a bruise on her arm.  At least one witness stated that Colina responded by taking out her pocket knife and trying to stab JT.  Kamarlon Walker, JT's cousin and Colina's boyfriend, intervened and asked Colina to leave, which she did.

---

[1] Because some of the witnesses share the same last name, we refer to them by their first names for the sake of clarity.

Upon returning home, Colina recounted the incident to Strauter. Strauter told Colina "he wanted to talk to [JT] to let him know that he can't be doing that." Strauter then headed to JT's home in Colina's white Nissan Maxima. A gun was underneath Strauter's seat. Strauter testified: "[T]he gun was just there. I didn't think that there was any bad vibes between anybody." Colina followed Strauter in his van.

In the meantime, JT went for a drive with Denise Doughty and Domenika Johnson, his fiancée. Soon after the three left Ralmar Avenue, JT saw Colina's Nissan driving in the opposite direction, and he told Denise to turn around and return to the house, which they did.

When Strauter arrived at JT's residence, he saw Kamarlon standing in the driveway. Strauter parked the Nissan in front of Kamarlon and asked him, "Why did you let your cousin throw a bottle at your girlfriend?" Soon thereafter, JT pulled up and confronted Strauter, saying "Get the fuck out of my driveway, bitch as[s] motherfucker. Bringing drama to my house." JT then entered the garage. Strauter and Kamarlon followed.

What happened next is disputed. Strauter testified that he saw JT talking to an older woman in the garage and decided to return to his car, claiming he did not want to be disrespectful. Other witnesses stated Strauter and JT traded punches in the garage, and Kamarlon eventually separated the two.

According to several witnesses, JT then entered the house. Domenika found JT in the bathroom inspecting himself for wounds; there were none. She said JT appeared angry. Sammy Williams, the in-home caretaker for JT's grandmother, testified JT went inside the house, said he was going to get his gun, and then called someone on the house telephone.

Meanwhile, about the time Strauter returned to his car, Colina pulled up in Strauter's van, blocking the Nissan. She emerged from the vehicle, went to the passenger side, removed a baseball bat, and began swinging it. Denise tried to take the bat away

from her, and a struggle ensued.  Strauter testified he took the bat away from both women and then told Colina to get into the car.[2]

Strauter testified that the events immediately before the shooting made him believe his life was in danger.  According to him, the following events occurred:  JT came out of the garage and said, "All right, bitch ass motherfucker.  You still here?  I got something for you."  JT then ran back in the garage, and Strauter went to the Nissan, grabbed the gun, and "racked it," putting a live round in the chamber.  Strauter then saw JT and Kamarlon standing in front of the car.  Kamarlon had a gun in his hand, and JT tried to take it.  The gun fell to the ground, and Kamarlon picked it up.  JT then said: "All right.  Then I got my own shit.  [F]uck this motherfucker."  As JT walked to the garage door he pointed at Strauter and said: "You bitch ass motherfucker.  I'm going to down your ass.  Watch."  Strauter then noticed a shotgun leaning out of the garage.  He had not seen the shotgun in the garage earlier, but he had seen the weapon on a previous visit to JT's residence.[3]  As JT reached for the shotgun, Strauter crouched, threw his arm between the car's door and frame, and shot three times.  Strauter did not aim at JT, or even look where he was shooting.  He "just pointed in that direction," wanting "to do something to distract [JT] long enough to get out [of] the driveway."  Unaware of whether he hit JT, Strauter drove off.  He was arrested later that day in San Jose.

Eye witness accounts of the shooting varied and were different from Strauter's account.  Domenika testified that she followed JT who ran out of the house yelling: "Bringing bullshit to my house."  The next thing she remembered was a shell casing "burning" her stomach.  She heard three gun shots.  Domenika then saw JT lying on the ground in a pool of blood.  Marsha Mitchell, a neighbor who had approached the house, testified she saw JT arguing with Colina and Strauter standing by the Nissan.  She then

---

[2] Phillip Donty Steward, a relative and close friend of JT who was also present, testified he took the bat away from a woman, whose identity he could not recall, and returned it to Colina.

[3] A search of JT's home several months after the shooting revealed a loaded shotgun on a shelf in the washroom in the garage.

3

saw Strauter shoot at JT from about 10 feet away. According to Marsha, JT had both hands raised in the air and was shot "in the front." Marsha heard about four shots. Philip Donty Steward initially stated he did not see the shooting but later claimed his earlier testimony was a lie, and testified he saw Strauter shoot JT "out of anger" but "unintentionally." Sammy saw JT run out of the garage with the house telephone in his hand as Strauter was backing out of the driveway in the Nissan. JT then ran back toward the garage, and Sammy saw the Nissan's door open and heard two shots. Colina, who testified for the defense, said she saw both JT and Kamarlon with guns when she arrived on the scene. Strauter told her to drive away. As she did so, she saw JT lift up his gun and "point[] it all over the place." She then heard gunshots, but she was unsure who fired them.

An autopsy of JT revealed three gunshot wounds. One shot entered through the left upper back. Another entered to the right of the midline of the back. A third shot entered the back of the right thigh and probably reentered the left leg below the knee. It was not possible to determine which gunshot wounds came first. Analysis of JT's blood revealed the presence of methamphetamine.

A grand jury returned an indictment against Strauter, alleging one count of murder (Pen. Code, § 187, subd. (a))[4] and one count of unlawfully possessing a firearm having been convicted of a felony (former § 12021, subd. (a)(1)). The indictment further alleged that, in the commission of the first count, Strauter personally discharged a firearm, causing great bodily injury (§ 12022.53, subd. (d)) and intentionally personally inflicted great bodily injury within the meaning of section 1203.75. Before trial, Strauter pleaded no contest to the firearm count and admitted he personally inflicted great bodily injury within the meaning of section 1203, subd. (k).

The remaining counts proceeded to trial. Strauter asked the trial court to instruct the jury on involuntary manslaughter, but the request was denied. The jury returned not guilty verdicts on the first and second degree murder counts, but it found Strauter guilty

---

[4] All subsequent statutory references are to the Penal Code.

4

of the lesser included offense of voluntary manslaughter. The trial court later imposed a sentence against Strauter for the convictions in this case and for two probation violations determined in earlier cases. As to the voluntary manslaughter count, the court imposed the midterm of six years, with a consecutive midterm of four years for the firearm enhancement. As to the unlawful possession count, the court sentenced Strauter to two years, but stayed the sentence. With the sentences for the probation violations, Strauter's total prison term was 11 years, four months.

II.
DISCUSSION

Strauter argues his conviction for voluntary manslaughter must be reversed because the trial court improperly denied his request for an instruction on the lesser included offense of involuntary manslaughter. We conclude there was no error. A defendant cannot commit involuntary manslaughter where he or she acts with a conscious disregard for life. (See *People v. Blakely* (2000) 23 Cal.4th 82, 91.) In this case, there is insufficient evidence to negate such a finding. Furthermore, even if we were to find error based on the failure to give the involuntary manslaughter instruction, we would nonetheless affirm because Strauter was not prejudiced.

We independently review a trial court's failure to instruct on a lesser included offense. (*People v. Cook* (2006) 39 Cal.4th 566, 596.) The trial court was required "to instruct fully on all lesser necessarily included offenses supported by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149.) "[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury."[5] (*Id.* at

---

[5] Strauter argues that a trial court must provide a requested instruction on a lesser included offense whenever there is *any* evidence on that issue deserving of any consideration whatsoever. Although this may have been the law at one time (*People v. Carmen* (1951) 36 Cal.2d 768, 773), it has been disapproved. (*People v. Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12; see also *People v. Wickersham* (1982) 32 Cal.3d 307, 324, overruled on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 200.)

p. 162, original italics.) Thus, the court must instruct when there is " 'evidence from which a jury composed of reasonable [persons] could have concluded' " the defendant is guilty of the lesser crime but not the greater. (*People v. Flannel*, *supra*, 25 Cal.3d at p. 684.) When assessing the sufficiency of the evidence we may not weigh the credibility of the witnesses, "a task exclusively relegated to the jury." (*Ibid.*)

In this case, Strauter was charged with first degree murder. The trial court agreed to instruct on the lesser included offense of voluntary manslaughter but refused Strauter's request to also instruct on the lesser included offense of involuntary manslaughter. Thus, the question is whether there was sufficient evidence to merit consideration by the jury that Strauter was guilty only of involuntary manslaughter.

Voluntary manslaughter is statutorily defined as the "unlawful killing of a human being without malice" that occurs "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) It may also be found "when the defendant kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense." (*People v. Barton*, *supra*, 12 Cal.4th at p. 199.) Involuntary manslaughter is statutorily defined as the "unlawful killing of a human being without malice" that occurs in the commission of (1) "an unlawful act, not amounting to a felony" or (2) "a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).)

In *Blakely*, our Supreme Court held that "when a defendant, acting with conscious disregard for life, unintentionally kills in unreasonable self-defense, the killing is voluntary, not involuntary, manslaughter." (*People v. Blakely*, *supra*, 23 Cal.4th at pp. 88-89.) In his dissent, Justice Mosk argued that a defendant who acts in unreasonable self-defense may lack the requisite mental state to commit voluntary manslaughter: "[A]n actor who entertains an actual, but unreasonable, belief in imminent danger of death or great bodily injury may happen not to harbor malice aforethought implied in a wanton disregard for human life. Wantonness, at least, may be lacking." (*Id.* at p. 98, italics omitted.) In response, the majority stated it had "no quarrel" with the view that a defendant who kills in unreasonable self-defense *may* sometimes be guilty of involuntary

manslaughter. (*Id.* at p. 91.) It "conclude[d] only that a defendant who, *with the intent to kill or with conscious disregard for life*, unlawfully kills in unreasonable self-defense is guilty of voluntary manslaughter." (*Ibid.*, original italics.)

Strauter argues that the trial court here should have instructed on involuntary manslaughter because there was evidence Strauter had an actual belief in the need to use self-defense and "the jury had been treated to a wide array of accounts of the events." Strauter maintains he was unable to appreciate the danger posed by his actions because it was a "confusing [and] fluid situation." In support, he points to his own testimony at trial. Specifically, Strauter testified that, at the time of the shooting, Kamarlon had a gun in his hand, JT was reaching for a shotgun, and Strauter "didn't know what to do." Strauter also testified he was not prepared to kill JT. Instead, he fired the gun because he needed to "do something" to distract JT so he could escape. Strauter claimed he did not aim at JT, he "just kind of threw [his] arm in the V of the door and just pointed in that direction."

We are not persuaded that this testimony gave rise to an obligation to give an involuntary manslaughter instruction. At most, this evidence suggests Strauter may have acted in imperfect self-defense and lacked an intent to kill. But it still shows a conscious disregard for life. Strauter did not claim he fired his weapon accidentally. He purposely shot three times in JT's direction, hitting JT twice in the back and once in the leg. If, as Strauter claims, he did not take aim before shooting, then his actions posed a deadly threat to all in his line of fire, including JT, Kamarlon,[6] and others who may have been in or around the garage. At trial, Strauter conceded he "basically sprayed the garage," and as far as he knew, he could have shot two people. Strauter claimed he was merely trying to distract JT. But instead of firing in the air, he fired toward the garage, where there were more people. This was not a case where the victim's death resulted from an unlucky blow. (See *People v. Cook, supra,* 39 Cal.4th at p. 597.) Instead, there was a

---

[6] Although Kamarlon was armed, there is no indication he posed a threat to Strauter. Multiple witnesses testified Kamarlon tried to deescalate the situation, and Strauter stated Kamarlon kept a gun away from JT after JT had threatened Strauter.

high probability Strauter's actions would result in death. We recognize that, in some instances, "The testimony of a single witness, including the defendant, can constitute substantial evidence requiring the court to instruct on [a lesser included offense]." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) But in this case, Strauter's admitted actions cannot support a conclusion that he acted without a conscious disregard for life.[7]

Finally, even if we were to determine that the jury should have been instructed on involuntary manslaughter, we would conclude the error was harmless. The parties dispute the measure we should apply in assessing prejudice. When errors do not implicate constitutional rights, we assess them under *People v. Watson* (1956) 46 Cal.2d 818, which requires us to reverse only if there is a reasonable probability that the defendant would have obtained a more favorable result. (*Id.* at p. 836.) But when errors implicate constitutional rights, we assess them under *Chapman v. California* (1967) 386 U.S. 18, which requires us to reverse unless it is clear beyond a reasonable doubt that the defendant would not have obtained a more favorable result. (*Id.* at p. 24.) We conclude that we need not resolve this dispute here because any error was harmless under either measure. Given Strauter's conscious disregard for life in shooting his weapon, it would have been nearly impossible for the jury to have found that he committed involuntary manslaughter and not voluntary manslaughter. It is unlikely enough that a reasonable juror could have believed Strauter did not intend to shoot JT since Strauter discharged his weapon three times and hit JT twice in the back and once in the leg. But even if Strauter could be believed that he shot in the direction of two people in the garage without aiming, he exhibited a conscious disregard for the lives of those who might have been in his line of fire.

---

[7] Alternatively, Strauter argues the trial court should have instructed on involuntary manslaughter because there was evidence he killed without malice in the commission of an inherently dangerous assaultive felony. But even under this theory, Strauter would have committed voluntary manslaughter, not involuntary manslaughter, if he had acted with a conscious disregard for life. (See *People v. Bryant* (2013) 56 Cal.4th 959, 969-971.) Strauter concedes as much in his brief.

## III.
## DISPOSITION

The judgment is affirmed.


_____
Humes, P.J.


We concur:


_____
Margulies, J.


_____
Banke, J.