Filed 4/23/15  P. v. Kim CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>SOO DUK KIM,<br><br>        Defendant and Appellant. | B251842<br><br>(Los Angeles County<br>Super. Ct. No. GA071852) |

        APPEAL from a judgment of the Los Angeles County Superior Court.  Michael D. Carter, Judge.  Affirmed.

        Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, David C. Cook and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

# SUMMARY

Soo Duk Kim, appellant, was previously convicted by a jury for the second degree murder of his girlfriend and this Court reversed the judgment finding that the trial court erred in failing to instruct on the lesser included offense of voluntary manslaughter based on sudden quarrel or heat of passion. (*People v. Kim* (Mar. 28, 2012, B227932) [nonpub. opn.].)

Appellant was retried and now appeals from a judgment entered after a second jury again found him guilty of one count of second degree murder (Pen. Code, § 187, subd. (a))[1] and found true the special allegation that appellant personally used a deadly and dangerous weapon, a knife, during the commission of the offense. (§ 12022, subd. (b)(1).) He was sentenced to 15 years to life in state prison, plus a one year enhancement.

On appeal, he contends that there was insufficient evidence to support his conviction of second degree murder because the prosecution did not prove that he acted with malice when he killed his girlfriend. Rather, appellant contends that he is guilty of voluntary manslaughter because he acted "unconsciously or without intent in the heat of passion." We disagree and affirm.

# BACKGROUND

## A. Prosecution's Case

In December 2007, Susan Kim lived in a two-story house on Raymond Avenue in Glendale. Appellant was Kim's boyfriend and had moved in with her a year earlier.

Appellant was unemployed and did not speak English very well. Kim's daughter, Jane Moon, attended college in San Diego but would periodically stay at Kim's house during weekends and winter and summer breaks. Appellant made little effort to get to know Moon except when Kim was also present.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Moon was staying at Kim's home for winter break to attend two weddings on December 15, 2007. On that day, Kim confided in Moon that she wanted to "kick out" appellant from the house. Kim appeared scared when she confided in Moon.

On December 16, 2007, around 8:00 a.m., Moon was sleeping in an upstairs bedroom of Kim's house when she was awakened by the sound of Kim and appellant arguing in the downstairs hallway. Moon heard Kim "trying to kick [appellant] out," appellant saying "'Give me money and I will leave,'" and Kim responding "'Are you crazy?'" and "'Why would I give you money? It is my house. Get out.'" Moon heard appellant threaten Kim, "'What if I kill you and then myself?'" Although appellant and Kim had numerous heated arguments over the course of their relationship, with both appellant and Kim yelling at each other, Moon had never seen appellant strike or hit Kim and had never heard appellant talk about killing Kim before December 16, 2007.

After the argument ended, Kim went upstairs to Moon's bedroom and apologized to Moon for waking her and telling Moon to go back to sleep. Moon went back to sleep and woke up a few hours later. Moon went downstairs to use the shower connected to Kim's downstairs bedroom. When she reached the bottom of the stairs and was in front of Kim's closed bedroom door, Moon heard whispered arguing between Kim and appellant. She could only hear parts of their argument. In response to something that appellant said, Moon heard Kim say, "Oh, so you are going to kill me?" While Moon showered, she could not hear appellant or Kim.

After Moon showered, about 1:00 or 1:30 p.m., Moon heard Kim and appellant arguing again. She heard them in the kitchen and then in the driveway. Moon saw appellant on the driveway throwing shoes and other items; Kim was taking pictures and yelling at appellant that she was going to call the police and get a restraining order.

Appellant then left. Kim left the house to run errands. At around 2:30 p.m., Moon's boyfriend, Christopher Rivera, came to the house and the two prepared to leave to run errands. Just as Moon and Rivera were about to leave, Kim returned to the house. They left Kim alone at the house.

3

Between 3:00 and 4:00 p.m., one of Kim's neighbors saw appellant backing his white Lexus out of Kim's driveway and speed away, almost clipping the house, as he left. The neighbor described appellant's driving as "erratic and in haste" that afternoon, although appellant was usually a careful and calm driver. A couple days before, the neighbor had heard loud yelling from inside the home, sounding like an argument between a man and a woman, although he could only hear the man.

Another neighbor was outside on her driveway between 2:00 and 4:00 p.m., when she heard screeching tires and looked and saw appellant driving "crazily," backing out of the driveway in his white Lexus and leaving at a fast speed.

At around 6:00 or 6:30 p.m., Moon and Rivera returned to the house. Rivera stayed in the car while Moon went into the front door of the house to get the remote control for the gate from the kitchen. A few feet into the house, Moon saw Kim lying on the kitchen floor with a pool of blood around her and a kitchen towel over her face. Moon started yelling and Rivera came into the house and took Moon outside. Moon and Rivera called 911.

Glendale Police Officer Joshua Luna arrived at appellant's house at 6:45 p.m. and saw Kim's body lying on the kitchen floor. Homicide Detective Petros Kmbikyan examined the crime scene, documenting blood and blood splatter and an indentation in the kitchen wall. Kmbikyan was present when the towel was removed from Kim's face, revealing blood on her face, open eyes and a puncture wound to the left side of her neck. In the sink was a knife with blood on it and a broken tip. The knife appeared to belong with those in a butcher block in the kitchen.

Lead Detective Arthur Frank, the investigating officer, was also present and observed the crime scene. Based on appellant's vehicle and Department of Motor Vehicle records, Frank sent Officer Michael Severo to conduct surveillance at an address on Occidental.

Early in the morning the next day, December 17, 2007, Police Officer Severo and his partner conducted surveillance from an unmarked vehicle at an apartment complex on South Occidental. Around 4:00 a.m., on December 17, 2007, the officers saw a white

4

Lexus enter the subterranean garage and Severo's partner left their vehicle and followed, hearing a male and female talking but could not tell what was being said. Approximately five minutes later, a white Lexus left the garage and the officers followed it to a motel on Vermont. Five to 10 minutes later, the white Lexus left the motel and the officers followed it again. The officers stopped the vehicle which had one occupant, appellant. When appellant got out of the car, Officer Severo noticed that he had a horizontal cut on his left wrist that was coagulating and blood on the left side of his pants. Appellant was arrested and taken to the police station.

At the police station, Detective Frank was waiting for Detective Matthew Prokosch, the Korean translator, to arrive before interviewing appellant when appellant asked Frank in English, "'Is the girl dead? Is Susan dead?'" Detective Frank told appellant that they could talk about it later and continued to wait for a translator. Detective Frank noticed that appellant had minor lacerations or cuts on both of his wrists, which Detective Frank bandaged.

At about 7:00 a.m., appellant waived his *Miranda* rights and was interviewed by Detective Frank with Detective Prokosch translating.[2] Appellant was cooperative and appeared remorseful. Detective Prokosch, trained in drug-recognition, observed that appellant did not exhibit signs of being under the influence of narcotics.

In his statement to the police, appellant indicated that at around 3:00 p.m., the day before, he and Kim had an argument in the kitchen. Kim found out that appellant was using marijuana and the day before Kim's death, Kim had taken away appellant's key. During the argument, appellant "unconsciously or unknowingly, unintentionally grabbed her head and hit her head against the wall a couple of times."[3] When appellant hit Kim against the wall, she screamed and fell down. Then appellant grabbed a knife from a

---

[2] The interview was tape recorded. The tape recording of the interview was played for the jury. A transcript of the interview is contained in the record. Detective Prokosch made notations on the transcript with corrections to the translation.

[3] At trial, Prokosch testified that the Korean word used by appellant could also mean "actions are automatic."

5

knife block in the kitchen and "unintentionally, or without him knowing" stabbed her in the stomach two or three times.

During the interview, Detective Frank began drawing a diagram of the kitchen so that they could talk specifically about the indentation in the wall, the knife block and the location of Kim's body. Appellant saw what Frank was doing and offered to draw the diagram and began drawing. Appellant drew the chairs that he and Kim were sitting in to eat when they argued. He identified the location of the wall that he pushed Kim's head into and confirmed that the hole in the wall was from when Kim hit her heard. He indicated that the knife he grabbed was by the sink, and where it was in relation to the gas range. He indicated the location Kim fell down, confirmed that she was screaming while she was on the floor, and drew on the diagram where she was lying down when he got the knife and stabbed Kim while she was on the ground.[4] Appellant told the police he left the knife in the sink and then drove away intending to kill himself.

Instead appellant met Choi Sookja, a woman he used to date, and she paid for a room at a Best Western motel on New Hampshire. In room 412, appellant changed out of his shirt before cleaning up the room and throwing it away into a trash can in the hallway. Appellant told Sookja that he had killed Kim but Sookja did not believe him and said that appellant was lying.

When asked why he got so angry during the argument, appellant stated that Kim took his key and was "verbally rude and abusive" and Kim had also told appellant in a belittling manner to go to Korea and live with his mother for six months. Appellant stated that Kim had seen him taking out marijuana from his car several days earlier and that they had talked several days earlier about not seeing each other.

Homicide Detective Keith Soboleski went to the motel on New Hampshire to see room 412. In a trash can holding open the door from the fourth floor stairwell to the hallway, Detective Soboleski found a bloody towel, shirt, and sweatshirt. He also found

---

[4] Detective Frank who had been at the crime scene and observed the blood spatters opined that appellant's description of stabbing Kim while she was on her back with her stomach up was consistent with the blood splatter he observed in the kitchen.

6

a room key for room 412 in the trash can. In room 412, Detective Soboleski found what appeared to be blood smears on the bed, blood droplets on the bathroom floor, and some blood on the furniture. The room was checked out to a female named Ja Sook. The surveillance tape of the motel showed the arrival of a white Lexus with two occupants, one male and one female, and the female checking in at the front desk.

According to the medical examiner, Kim died from four fatal stab wounds. Specifically, two fatal stab wounds went through her heart, one went through her lung and one of them was five and a half inches deep and pierced both her heart and left lung. Kim also had two non-fatal stab wounds—a two-inch wound to the neck and a superficial wound behind her left ear. In addition to the six stab wounds, Kim had a bruise on the back of her head.

## B. Defense's Case

Appellant did not testify in his defense.

Forensic psychiatrist Manuel St. Martin evaluated appellant for a mental disorder in 2008 and found that he suffered from schizophrenia. Symptoms of the disorder include inability to plan and to speak in a way that would be understood by others. According to Dr. St. Martin, these patients "strike out at others for no apparent purpose." A schizophrenic that is not medicated loses touch with reality and hallucinations are often a sign. The mere fact that one has such a disorder does not necessarily prevent one from forming malice aforethought. However, an acute form of this disorder may prevent someone from forming malice aforethought. Dr. St. Martin opined that appellant suffered from schizophrenia at the time of the commission of the offense.

As to a hypothetical involving a person who, as a result of verbal abuse over a period of "a day or two," yelled, threw things randomly, and broke glassware, Dr. St. Martin opined that the hypothetical subject showed signs of a person being in a psychotic state. Dr. St. Martin indicated that someone in a psychotic state could also come out of it hours later. When given a hypothetical involving a person who after killing someone, asked another woman to help him obtain a hotel room, and thereafter, in that room, changed out of the clothing worn during the time of the crime, attempted to cut his own

7

wrist, managed to leave the room with the woman to check into another hotel, and after encountering the police, gave a statement describing how and why they killed the victim, Dr. St. Martin opined that the person in the hypothetical did not "sound like a person" who was "involved in a psychotic state." As to the same hypothetical person, Dr. St. Martin was further asked to assume that in response to police questioning as to his motive for the killing, the person responded, "Because she was rude and telling me to leave the house," Dr. St. Martin acknowledged that the stated motive would be consistent with one based on reality as opposed to one caused by a psychotic state. Dr. St. Martin acknowledged that he did not treat appellant.

Psychologist Veronica Thomas evaluated appellant and found that he suffered from paranoid schizophrenia. This type of illness affects someone's ability to process information and engage in routine decisionmaking and causes hallucinations and delusions. Such an illness, depending on several factors, can prevent someone from forming malice aforethought. A psychotic state is a period of time, whether minutes or hours or longer, wherein someone is unable to distinguish what is real from what is unreal and what is accurate from what is inaccurate. Dr. Thomas opined that appellant suffered from this kind of disorder at or around the time of the killing. Dr. Thomas acknowledged that it would be rare for a psychotic state to last simply minutes. Dr. Thomas also acknowledged that what was going on in appellant's mind at the time of the crime remained a question as no one could "jump into a person's mind." Dr. Thomas had "no reason to believe one way or the other that the defendant was in a psychotic state at the time" of the crime. The facts of the case were consistent with either presence or absence of a psychotic state. Dr. Thomas acknowledged that concealing clothing after a killing was consistent with hiding evidence of a crime as opposed to acting under a psychotic state.

**C. Rebuttal**

Forensic psychiatrist Sanjay Sahgal testified that everything that a schizophrenia patient does is intentional but the act would be responsive to an altered reality. To Dr. Sahgal, a hypothetical reflecting the facts of the case, including the killing, the concealing

8

of clothing, and the police interview, did not contain information suggesting that the person was suffering from a psychotic state. Dr. Sahgal also opined that there was nothing in the hypothetical that would suggest that the person did not intend to kill or did not understand that what he was doing was violent. One significant indication to support this conclusion was that the subject smashed the victim's head repeatedly and thereafter found a knife which he then used to stab the victim in fatal areas. The absence of data suggesting psychosis and the available data as a whole suggested that there was "no psychosis." The fact that the subject drew a diagram to the police indicating where he struck the victim in the head and where she fell was an additional indication that he likely was not psychotically impaired at the time of the crime. Dr. Sahgal testified that schizophrenia is serious enough that symptoms of it are usually visible. Dr. Sahgal testified that if violence was motivated by delusion, the subject usually would give a reason for the crime that is grounded in the delusion. For schizophrenia patients, the notion that they would have an hour of psychosis is absurd to Dr. Sahgal. The psychotic state would last on the order of days to weeks.

Dr. Sahgal testified that the prosecution's hypothetical could be converted to one that showed someone acting out of psychosis by adding a few facts. Dr. Sahgal acknowledged that there was no way to be certain whether one was acting out of psychosis or not for any given time.

### D. Conviction and Sentencing

The jury convicted appellant of second degree murder under section 187, subdivision (a) and found to be true a special allegation that appellant had used a knife in the commission of the offense under section 12022, subdivision (b)(1). Appellant was sentenced to a base term of 15 years to life in state prison, plus one year for the weapon enhancement. The court granted appellant 2,146 days of custody credit and imposed various fines and fees.

Appellant appeals.

## DISCUSSION

On appeal, appellant argues that insufficient evidence supports his second degree murder conviction as appellant's statement that he was in a "somnolent robotic state" when he fatally stabbed Kim was uncontradicted and the evidence showed that appellant and Kim had been "arguing for days and each became increasingly hostile after [Kim] threatened to force [appellant] out of the house." We affirm.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "When undertaking such review, our opinion that the evidence could reasonably be reconciled with a finding of innocence or a lesser degree of crime does not warrant a reversal of the judgment." (*People v. Hill* (1998) 17 Cal.4th 800, 849.)

The Penal Code defines murder as "the unlawful killing of a human being . . . with malice aforethought." (§ 187.) As relevant here, murder is in the first degree if the killing was willful, deliberate and premeditated. (§ 189.) Otherwise, it is in the second degree. (§ 189.) Manslaughter is defined as "the unlawful killing of a human being without malice." (§ 192.) Although generally the intent to unlawfully kill constitutes malice, malice is presumptively absent when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation. (*People v. Breverman* (1998) 19 Cal.4th 142, 153-154; *People v. Manriquez* (2005) 37 Cal.4th 547, 583-584; see § 192, subd. (a).)

10

The heat of passion requirement for manslaughter has both an objective and subjective component. (*People v. Manriquez, supra*, 37 Cal.4th at p. 584; *People v. Wickersham* (1982) 32 Cal.3d 307, 326-327.) "The defendant must actually, subjectively, kill under the heat of passion." Plus, objectively, ""this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances."" (*People v. Manriquez, supra*, 37 Cal.4th at p. 584.)

As the Supreme Court has explained, "'Although section 192, subdivision (a), refers to "sudden quarrel or heat of passion," the factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation.'" (*People v. Manriquez, supra*, 37 Cal.4th at p. 583.) Moreover, as the Supreme Court has repeatedly stated, the provocative conduct may be physical or verbal; no specific type of provocation is required. (*People v. Valentine* (1946) 28 Cal.2d 121, 140 [resolving a split in authority as to whether words of abuse, insult or reproach are of themselves sufficient to incite the heat of passion by concluding it is a question of fact for the jury to decide]; *People v. Manriquez, supra*, 37 Cal.4th at pp. 583-584; *People v. Breverman, supra*, 19 Cal.4th at p. 163; *People v. Wickersham, supra*, 32 Cal.3d at p. 326.) In certain circumstances, insults may be sufficient provocation under section 192 and "the question is whether they would, either alone or combined with other provocative circumstances, arouse a heat of passion in a reasonable person." (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 236, p. 1081.) Nonetheless, the use of words commonly employed to taunt another, however grievous, does not ordinarily drive a reasonable person to such passion as would reduce an unlawful killing to manslaughter. (*Ibid.*) Thus, courts have held that gestures and words under the circumstances of a particular case are not, as a matter of law, adequate provocation to support giving a heat of passion instruction. (See, e.g., *People v. Manriquez, supra*, 37 Cal.4th at p. 586; *People v. Lucas* (1997) 55 Cal.App.4th 721, 739.)

Here, sufficient evidence supported the jury's conclusion that appellant acted with malice and did not act in the heat of passion. Appellant stated that he killed Kim because

11

she took away his key, was rude and verbally abusive and had told him in a belittling tone to live with his mother in Korea.  He also stated that Kim had seen him getting out marijuana several days earlier, that they had talked about not seeing each other several days earlier, and that his key was taken away the day before.

The jury could reasonably conclude that in the circumstances of the case the verbal abuse and belittling tone would not naturally arouse heat of passion in an ordinarily reasonable person.  (*People v. Manriquez*, *supra*, 37 Cal.4th at p. 584.)  Moreover, there was substantial evidence to support the conclusion that appellant did not subjectively kill Kim in a heat of passion.  Appellant had threatened to kill Kim in the morning and again in the early afternoon, and left for almost two hours before returning to the house and arguing with and killing Kim.  Although appellant contends that he acted "unknowingly" or "unconsciously" when he killed Kim, he was able to describe and draw for the police in some detail hitting Kim against the wall and stabbing her in the kitchen.

While the testimony of a single witness, such as the defendant, can constitute substantial evidence requiring the court to instruct on heat of passion provocation (*People v. Lewis* (2001) 25 Cal.4th 610, 646) as we concluded in the prior appeal, determining the weight and credibility of the witness is a task solely for the jury.  (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162.)

**DISPOSITION**

We affirm the judgment.

NOT TO BE PUBLISHED.

CHANEY, J.

We concur:

ROTHSCHILD, P. J.          BENDIX, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12