Filed 10/22/20  P. v. Muro CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ANTONIO MURO,<br><br>     Defendant and Appellant. | D076118<br><br><br><br>(Super. Ct. No. SCE383359) |


APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Remanded with directions to amend abstract of judgment, and in all other respects affirmed.

David W. Beaudreau, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Antonio Muro guilty of one count of first degree murder (Pen. Code, § 187, subd. (a)),[1] with a further finding that he personally used a deadly or dangerous weapon (a knife) (§ 12022, subd. (b)(1)). Muro admitted two prison priors. (Former § 667.5, subd. (b).) The trial court sentenced Muro to prison for an indeterminate term of 25 years to life, plus one year for the weapon enhancement. At the sentencing hearing the trial court stated that the two one-year enhancements based on Muro's prison priors would be "stricken and/or stayed." The abstract of judgment indicated that the enhancements were stayed.

Muro contends that (1) defense counsel provided ineffective assistance by failing to request that the jury be instructed with CALCRIM No. 522, which states that provocation may reduce first degree murder to second degree murder; and (2) due to a change in the law after Muro was sentenced, he is no longer eligible for the imposition of the two one-year enhancements based on his prison priors (§ 667.5, subd. (b)).

With respect to the first issue, we conclude that Muro has not met his burden to establish that defense counsel was ineffective. With respect to the second issue, the parties agree, and we concur, that because section 667.5, subdivision (b) has been amended, Muro is not eligible for the two one-year enhancements based on his prison priors. Accordingly, we direct the trial court to amend the abstract of judgment to strike the two one-year enhancements. In all other respects, the judgment is affirmed.

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

I.

FACTUAL AND PROCEDURAL BACKGROUND

At approximately 2:00 p.m., on July 28, 2018, Muro walked up to 25-year-old David Twofeathers Durbin, who was standing in front of a 7-Eleven store in El Cajon, looking down at his cell phone. Muro raised a knife and stabbed Durbin in the chest, penetrating his heart and killing him. Muro said, "Remember this, mother fucker, remember this," and then walked away.

Muro and Durbin had encountered one another only once before, a few days earlier, when Muro was spending time with J.C., Durbin's long-time girlfriend.[2] Durbin and J.C. were homeless, and Durbin was living in a drainage canal near a commercial area in El Cajon. Both were addicted to heroin. Muro regularly used marijuana and methamphetamine, and he lived either at a friend's house, someone else's trailer, or in his car. Approximately a week before the stabbing, J.C. and Muro had spent the evening together, using drugs. J.C. told Muro that Durbin had, in the past, inflicted domestic violence on her and, according to Muro, described Durbin as her ex-boyfriend.

At the end of their evening together, Muro drove J.C. to the neighborhood near the drainage canal. J.C. saw Durbin walking with what she believed was the duffel bag in which she kept her clothing. J.C. got out of Muro's car and approached Durbin. J.C. grabbed onto her bag and asked Durbin to hand it over. According to J.C., Durbin said, "Let go of the bag, or else I am going to sock you." Seeing the interaction between J.C. and Durbin, Muro got out of his car, approached Durbin, and punched him in the face three times. Durbin made a comment about having eaten the punches, meaning that they didn't faze him, and walked away toward the drainage canal with J.C.'s bag.

---

[2] We refer to witnesses by their initials to protect their privacy.

Once in the drainage canal, Durbin told two friends about the incident, and all three of them went back to the area where it occurred. Muro and J.C. also returned to the area because, according to Muro, J.C. insisted on trying to retrieve her bag. At some point, J.C. got out of Muro's car. Then, an altercation between Muro and Durbin took place, in which Muro drove his car toward Durbin a few times, and Durbin threw wrenches and a heavy bolt cutter tool toward Muro's car. During the incident, Durbin yelled at Muro to get out of the car. According to Muro, Durbin said, "What's up now, mother fucker, you don't know who you're messing with." By the end of the incident, Muro's front windshield and one rear window had been shattered. Eventually, Muro drove away without J.C. According to Muro, for the next few days he was afraid that Durbin or his friends would find and attack him.

Muro and J.C. met two or three days later and spent time together. J.C. stayed overnight with Muro. Muro and J.C. talked about the earlier incident between Muro and Durbin. According to J.C., she told Muro that Durbin had returned her bag, that Muro had been out of line toward Durbin, and that Muro should leave Durbin alone. Muro felt like J.C. was taking Durbin's side regarding the incident. J.C. testified that during the conversation Muro told her that Durbin "was lucky that he punched him because [Muro] normally stabs people." After spending time with J.C. the second time, Muro eventually dropped her off in the area near the drainage canal.

One of Muro's friends, C.R., works at a laundromat near the drainage canal and knows Durbin and J.C. According to Muro's testimony, C.R. told him one or two days before the stabbing that he had heard about the incident between Durbin and Muro from several people. As Muro recounted what C.R. told him, Durbin was asking about Muro's whereabouts, and Durbin or

4

someone else stated that if Muro is seen in the area, he had better watch his back. C.R.'s statements caused Muro to continue to worry about being attacked.

According to certain evidence at trial, Muro came to C.R.'s house on the morning of the stabbing and asked C.R. to accompany him to "get" Durbin, which C.R. interpreted as referring to a fistfight.[3] C.R. declined to do so and told Muro that J.C. "wasn't worth it." Muro denied he ever asked C.R. to help him "get" Durbin.

At trial, Muro testified that on the day of the stabbing, he went to a neighborhood in El Cajon, not far from the drainage canal, to spend time at C.R.'s house. Instead, Muro encountered a different friend, identified only as "Perro," who also lives in the area. According to Muro, he smoked marijuana with Perro. Then, with Perro driving Muro's car, they went to eat at a taco shop that is very close to the drainage canal. While approaching the taco shop, Muro saw Durbin walking down the street, and Muro decided to confront Durbin to try to get Durbin to leave him alone. Video from security cameras captured the rest of the incident.

Perro parked the car, and Muro got out and walked toward Durbin, who had stopped near a sidewalk in front of a 7-Eleven store with a friend standing near him. According to Durbin's friend, he and Durbin were walking to the 7-Eleven to get drinks and snacks. Durbin was looking down at his cell phone and did not see Muro approach. Without saying anything, Muro raised a knife and plunged it into the left side of Durbin's chest. Durbin's friend, who was also looking at his phone, heard a thud, looked up,

---

[3] C.R. told a detective that the conversation with Muro took place on the morning of the stabbing. During his trial testimony, C.R. was less clear about the timing of the conversation.

and saw a six-inch long hunting knife being pulled out of Durbin's chest. Muro stepped back and stated, "Remember this, mother fucker, remember this," while looking at Durbin. Muro then walked away, got into the car with Perro, and left.

Paramedics arrived and transported Durbin to the hospital, where he was pronounced dead less than an hour after the stabbing. An autopsy revealed a stab wound to Durbin's left chest that was four to five inches long and went through Durbin's heart and into his lung.

Muro was charged with first degree murder (§ 187, subd. (a)), with the further allegation that he personally used a deadly and dangerous weapon (a knife) (§ 12022, subd. (b)(1)). It was also alleged that Muro incurred two prison priors. (Former § 667.5, subd. (b).)

At trial, Muro testified and admitted to stabbing Durbin. According to Muro, he was not looking for Durbin on the day of the stabbing, but only happened to see him on the way to the taco shop and decided to confront Durbin because he wanted to do something about his fear of being attacked. Muro testified that when he got out of the car, he was thinking that he was "probably going to go punch this guy." As Muro explained his state of mind, "I want to go confront him about being all up in my business and making me feel like I'm going to get—I wanted it to stop. I'm terrorized. I'm scared. I'm afraid. I'm shocked that—of what he did, and it's still kind of fresh in my mind. It's been on my mind. I haven't been able to sleep, and it's really a situation that I wanted to stop because it's really, really troublesome to me. And I'm—I want to pretty much, like, defend myself like in a way where— where you're not going to be stepping all over me, and you're not going to keep traumatizing me and leaving this impression on my mind that you're going to get me." Muro felt it was necessary to confront Durbin because "he

6

was going to do . . . some kind of violence towards me." As Muro explained, "I decided to go put an end to this—this feeling that I had. I didn't want to feel terrified anymore. I wanted to defend myself."

Muro testified that while he was walking toward Durbin, he started to get scared and panicked about whether Durbin had a weapon. Therefore, according to Muro, he wanted to have something to protect himself, and as he got near Durbin he took out a pocket knife that he always carries with him.[4] As Muro testified, "I started having the thought in my head, like, 'well, what if he has something on him?' And now I'm starting to get more scared and more panicked about the situation as I'm heading towards him, and I'm pretty fearful. So at that moment, I think I started to feel and see if I had something to—to protect myself with in case—in case he had something or anything of that sort." Muro explained that although he understood he was not in actual immediate physical danger from Durbin, "in my mind, the second this guy looks at me and gets a chance, I'm going to get it."

According to Muro, he then took a wild swing at Durbin with the knife, not aiming at anything. Muro explained, "As I'm walking towards him, then I'm getting scared, like, man, I don't know. I'm right there with [Durbin], and I just take a wild swing, like, I don't know, just randomly. I wasn't aiming at anything. I was just swinging it at him." Muro felt a connection with Durbin's body and then pulled out the knife. He did not think that he had killed Durbin and did not want Durbin dead. Moreover, Muro claimed

---

[4]    The prosecutor argued at trial that the security video from the incident shows Muro walking up to Durbin with a knife at the ready long before he reached Durbin. Defense counsel argued that in viewing the security camera video, it is not clear when Muro took out the knife, and he pointed out that Muro claimed he took out the knife only shortly before reaching Durbin.

that although he was not aiming for Durbin's chest, he also did not understand that someone could die from getting stabbed in the chest.

The jury convicted Muro of first degree murder and made a true finding on the weapon enhancement. Muro admitted two prison priors. (Former § 667.5, subd. (b).) The trial court imposed an indeterminate prison term of 25 years to life, plus a one-year term for the weapon enhancement. The trial court also imposed and stayed two one-year prison terms based on Muro's prison priors.[5]

## II.

## DISCUSSION

A. *Muro's Contention That Defense Counsel Was Ineffective for Failing to Request That the Jury Be Instructed with CALCRIM No. 522*

We first address Muro's contention that defense counsel offered ineffective assistance of counsel because he failed to request that the jury be instructed with CALCRIM No. 522, which would have informed the jury that provocation may reduce first degree murder to second degree murder.

### 1. *Applicable Background*

To assess Muro's argument, we first review some of the background of how the jury was instructed and how defense counsel chose to defend the case.

"First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation. [Citation.] Malice may be express (intent to

---

[5] At the sentencing hearing, the trial court stated that "the two prison priors are . . . stricken and/or stayed" because "the two prison priors are not necessary to add to this rather long term." The sentencing minute order incorrectly states that each of the one-year terms for the prison priors were "stayed per [Penal Code section] 654." The abstract of judgment states that the sentences for the prior prison terms were stayed without specifying the basis for the stay.

kill) or implied (intentional commission of life-threatening act with conscious disregard for life). [Citation.] Second degree murder is an unlawful killing with malice, but without the elements of premeditation and deliberation which elevate the killing to first degree murder. [Citation.] To reduce a murder to second degree murder, premeditation and deliberation may be negated by heat of passion arising from provocation. [Citation.] If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder. [Citation.] If the provocation would cause a reasonable person to react with deadly passion, the defendant is deemed to have acted without malice so as to further reduce the crime to voluntary manslaughter. [Citation.]" (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332 (*Hernandez*).) " ' " 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually,* but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.' " ' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1226.)

The jury in this case was instructed with the standard instructions on the degrees of murder and the theories under which murder could be reduced to voluntary manslaughter. Specifically, with respect to the degrees of murder, the jury was instructed with CALCRIM No. 521, which explained that the jury could find Muro guilty of first degree murder only if the People met their burden to prove that Muro acted willfully, deliberately, and with premeditation. Included in this instruction is the statement that "[a] decision to kill made rashly, impulsively, or without careful consideration is not

9

deliberate and premeditated." With respect to voluntary manslaughter, the jury was instructed with CALCRIM Nos. 570 and 571 that murder could be reduced to voluntarily manslaughter in two ways: (1) if Muro acted in imperfect self-defense; or (2) if Muro was provoked, causing him to act in the heat of passion. As the jury was instructed, "The defendant acted in imperfect self-defense if: [¶] 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable." Regarding heat of passion, the jury was instructed, "The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

Although the trial court agreed to instruct the jury on the possibility of reducing murder to voluntary manslaughter based on provocation in CALCRIM No. 570, defense counsel did not ask the trial court to instruct with CALCRIM No. 522 on the concept of reducing first degree murder to second degree murder based on provocation, and the trial court did not do so.[6] CALCRIM No. 522 states, in relevant part: "Provocation may reduce a

---

[6]    The instruction on provocation for second degree murder in CALCRIM No. 522 is a pinpoint instruction that need not be given sua sponte by the trial court, even when supported by substantial evidence. (*People v. Rogers* (2006) 39 Cal.4th 826, 878-879; *People v. Rivera* (2019) 7 Cal.5th 306, 328.)

10

murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]" (CALCRIM No. 522.)

During closing argument, defense counsel focused primarily on the contention that the jury should find Muro guilty of voluntary manslaughter, rather than murder, because he acted in imperfect self-defense. Defense counsel acknowledged that the jury could also reach a verdict of voluntarily manslaughter if it found that Muro was provoked and acted in the heat of passion. However, defense counsel expressly informed the jury that he had chosen not to advocate that approach. Defense counsel argued, "Why is this voluntary manslaughter? . . . Because based on imperfect self-defense. Some of you might think, 'Well, there's some heat of passion still brewing there.' You think whatever you want. This is my argument. I'm making my argument to you. This is imperfect self-defense."

When discussing the degrees of murder, defense counsel set forth the reasons that the jury should find second degree murder rather than first degree murder, but he did not argue that a verdict of second degree murder was warranted based on the theory that Muro was provoked and thus did not premeditate and deliberate. With respect to the concept of premeditation, defense counsel made the following argument: "What evidence [is there] that he decided to kill for premeditation? His only decision was to use some force to keep this guy from coming at him anymore. 'Leave me alone.' It's rash, impulsive, without careful consideration. There's certainly some time

11

thinking as they're parking the car 'I'm going to do something to this guy,' whether it's 'I'm going to punch him out. We're going to yell at each other and wrestle,' whether he's going to pull the knife, there's seconds, and nothing else happens."

    2.    *Legal Standards for Ineffective Assistance of Counsel*

A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*); *People v. Frye* (1998) 18 Cal.4th 894, 979.) To establish ineffective assistance "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) An ineffective assistance of counsel claim fails if the defendant makes an insufficient showing on either one of these components. (*Strickland*, at p. 687.)

"It is defendant's burden to demonstrate the inadequacy of trial counsel." (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) "It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Mai, supra*, 57 Cal.4th at p. 1009.)

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697.)

3. *Muro's Arguments as to Why Defense Counsel's Performance Was Deficient*

Muro devotes a significant portion of his argument to establishing that defense counsel acted below the standard of care in not requesting that the jury be instructed with CALCRIM No. 522.  Apart from his contention that substantial evidence would have supported an instruction with CALCRIM No. 522, Muro makes three arguments to show that defense counsel could have had no possible reasonable tactical purpose for failing to request the instruction.

First, he argues that because the jury was instructed that provocation could reduce a murder to voluntary manslaughter, there was no rational reason for defense counsel to fail to also request that the jury be instructed that provocation can reduce first degree murder to second degree murder.  According to Muro, any competent defense counsel would have requested such an instruction because a reduction to second degree murder from first degree murder based on provocation could be found *even if* the jury did not reduce murder to voluntary manslaughter based on provocation.  For this argument, Muro relies on the principle that establishing provocation to reduce the degree of murder is less demanding than establishing provocation to reduce murder to voluntary manslaughter.  "[A] *subjective* test applies to provocation as a basis to reduce malice murder from the first to the second degree:  it inquires whether the defendant in fact committed the act because

13

he was provoked.  The rationale is that provocation may negate the elements of premeditation, deliberateness and willfulness that are required for that degree of the crime.  . . .  But more is required to reduce malice murder to voluntary manslaughter.  For that, an objective test also applies:  the provocation must be so great that, in the words of CALCRIM No. 570, it 'would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.' " (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000-1001, italics added & citation omitted.)

Second, Muro reads defense counsel's closing argument as advocating to the jury that it should rely on the concept of provocation to reduce first degree murder to second degree murder.[7]  Muro contends that because defense counsel argued that provocation should reduce first degree murder to second degree murder, he was ineffective for not requesting CALCRIM No. 522 to give the jury an instructional foundation for his argument.

Third, as Muro points out, there was evidence that he used drugs prior to the stabbing, but the jury was instructed that it could consider evidence of voluntary intoxication only in a limited way, namely, "only in deciding whether the defendant acted willfully, deliberately or with premeditation, or with express malice aforethought."  (Emphasis omitted)  According to Muro, in light of the limited context in which the jury could consider evidence of voluntary intoxication, any competent defense counsel would have requested that the jury  be instructed with CALCRIM No. 522.  Specifically, if

---

[7]     Specifically, Muro focuses on the portion of defense counsel's closing argument we have quoted above, in which defense counsel argued, "What evidence [is there] that he decided to kill for premeditation?  His only decision was to use some force to keep this guy from coming at him anymore. 'Leave me alone.'  It's rash, impulsive, without careful consideration."

14

instructed with CALCRIM No. 522 the jury could have considered Muro's voluntary intoxication in determining that provocation negated premeditation or deliberation (and thereby reduced first degree murder to second degree murder), even though the jury was precluded from considering voluntary intoxication when determining whether provocation reduced murder to manslaughter.

We need not, and do not, decide whether any of Muro's arguments have merit in establishing that defense counsel acted below the standard of care in failing to request that the jury be instructed with CALCRIM No. 522. As we will explain, Muro has not met his burden to establish that any failure by defense counsel to request the instruction was prejudicial. (*Strickland*, *supra*, 466 U.S. at p. 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."].)

4.    *Muro Has Not Established Prejudice*

In establishing ineffective assistance of counsel, "[a] defendant must prove prejudice that is a ' "demonstrable reality" not simply speculation.' . . . Prejudice requires "a reasonable probability that a more favorable outcome would have resulted . . ., i.e., a probability sufficient to undermine confidence in the outcome.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241, citations omitted.) Therefore, our inquiry is whether it is reasonably probable that the jury would have convicted Muro of second degree murder, rather than first degree murder, if it had been instructed with CALCRIM No. 522.

Muro argues that if CALCRIM No. 522 had been given, there is a reasonable probability the jury would have convicted Muro of second degree murder because according to Muro's testimony, "he acted while under the stress of intense emotion (fear and paranoia) that obscured his reasoning and

15

judgment. And the facts elicited at trial showed Muro used drugs on the morning of the stabbing and in the days before and after the car incident. [¶] . . . [H]is substance abuse helped explain why he subjectively and unreasonably feared Durbin." However, as we will explain, based on Muro's own testimony describing the stabbing and his state of mind when it occurred, even if Muro acted out of fear and paranoia, there is no evidence that Durbin said or did anything that could be described as *provocation*.

As case law establishes, the term "provocation" in CALCRIM No. 522, has its ordinary, nontechnical meaning. (*People v. Cole* (2004) 33 Cal.4th 1158, 1217-1218 ["Provocation and heat of passion as used in the instructions here bore their common meaning, which required no further explanation in the absence of a specific request."].) "Provocation means 'something that provokes, arouses, or stimulates'; provoke means 'to arouse to a feeling or action[;]' . . . 'to incite to anger.' (Webster's Collegiate Dict. (10th ed. 2002) p. 938[.)]" (*Hernandez, supra*, 183 Cal.App.4th at p. 1334.) " 'The evidentiary premise of a provocation defense is the defendant's emotional reaction *to the conduct of another*, which emotion may negate a requisite state.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 541, italics added.) "[P]rovocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation." (*Hernandez,* at p. 1334.)

In explaining the manner in which provocation can reduce first degree murder to second degree murder, our Supreme Court has emphasized that the provocation must occur under circumstances in which it negates the possibility that the defendant planned the killing *in advance*. "[W]here the evidence of provocation would justify a jury determination that the accused had formed the intent to kill *as a direct response to the provocation and had acted immediately*, the trial court is required to give instructions on second

16

degree murder under this theory. The fact that heated words were exchanged or a physical struggle took place between the victim and the accused before the fatality may be sufficient to raise a reasonable doubt in the minds of the jurors regarding whether the accused planned the killing *in advance*." (*People v. Wickersham* (1982) 32 Cal.3d 307, 329, italics added (*Wickersham*); see also *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1705 ["The *Wickersham* court explained that the evidence of provocation must 'justify a jury determination that the accused had formed the intent to kill as a *direct* response to the provocation and had acted *immediately . . . .*'"].)

During his testimony, Muro extensively described his state of mind during the stabbing. However, Muro said nothing about any statement or conduct by Durbin that might have provoked him, without premeditation and deliberation, to rashly and impulsively decide to stab Durbin. Instead, it is undisputed that at the time of the stabbing Durbin was not aware of Muro's presence, as Durbin was looking down at his cell phone, and there was no interaction between the two men before Muro decided to stab Durbin. Further, Muro agreed during his testimony that Durbin was not looking at him and did not see him coming. Muro also confirmed that he did not announce his presence to Durbin. As Muro described his decision to stab Durbin, he was originally going to punch Durbin, but based solely on Muro's *own internal thought process*, he decided to commit a stabbing instead. Specifically, Muro explained that it occurred to him that Durbin might have a weapon, and he therefore wanted to arm himself. He therefore took out his knife and used it to stab Durbin.

Because there was absolutely no interaction between Durbin and Muro in the moments leading up to the stabbing, and because Muro admitted that his decision to commit a stabbing evolved solely from his own internal

17

thought process, there was no evidentiary basis for the jury to find that Durbin engaged in any provocative conduct that caused Muro to "act[] immediately" in "direct response" to that conduct by rashly and impulsively forming the intent to kill Durbin. (*Wickersham*, *supra*, 32 Cal.3d at p. 329.) The evidence presented at trial simply did not permit the jury to find that Muro was *provoked*, in that he had an "emotional reaction to the conduct of another" that negated premeditation and deliberation. (*Nelson*, *supra*, 1 Cal.5th at p. 541.)

Muro contends that, if instructed with CALCRIM No. 522, the jury could have found that Muro was provoked because he stabbed Durbin out of the "intense emotion" of "fear and paranoia." Muro argues he was still fearful of Durbin because of the violent incident between the two men that occurred approximately a week earlier, and because that irrational fear and paranoia was amplified by Muro's drug use. However, the ordinary meanings of the terms "provoke," and "provocation" do not, in normal speech, apply to a situation in which someone attacks an unwitting victim because he is afraid and paranoid that the victim might come looking for him based on an incident that happened a week earlier. When a defendant acts out of fear and paranoia by making a preemptive strike toward someone who does not even know the defendant is present, the defendant may reasonably be described as acting based on the intense emotion of fear and paranoia, but the defendant may not reasonably be described as having "acted immediately" in "direct response" to any provocation. (*Wickersham*, *supra*, 32 Cal.3d at p. 329.)

In sum, because there was no evidence at trial that Durbin did anything that might have provoked Muro to act rashly, impulsively, and without premeditation or deliberation, we conclude that even had the jury

18

been instructed with CALCRIM No. 522, there is no reasonable probability that the jury would have convicted Muro of second degree murder rather than first degree murder.

B.    *The Enhancements for Muro's Prison Priors Must Be Stricken*

We next address Muro's contention that he is no longer eligible for the two one-year sentencing enhancements imposed and stayed under section 667.5, subdivision (b).

When Muro was sentenced in June 2019, the law provided for a one-year enhancement for each separate prior prison term served by the defendant.  (Former § 667.5, subd. (b).)  The abstract of judgment states that the trial court imposed and stayed the two one-year enhancements for Muro's prior prison terms.

Effective January 1, 2020, Senate Bill No. 136 amended section 667.5, subdivision (b).  (Stats. 2019, ch. 590, § 1.)  That section now limits one-year prior prison term enhancements to cases where the prior prison term was based on a sexually violent offense, as defined in Welfare and Institutions Code section 6600, subdivision (b).  It is undisputed that Muro's prior prison terms were not for sexually violent offenses.  Accordingly, Muro is no longer within the class of offenders who are eligible for the additional one-year prior prison term enhancements under section 667.5, subdivision (b).  As the People acknowledge, because Muro's judgment is not yet final, he is entitled to the benefit of the change in the law.  (*People v. Jennings* (2019) 42 Cal.App.5th 664, 682; see also *In re Estrada* (1965) 63 Cal.2d 740.)

Accordingly, the abstract of judgment should be amended to strike the two one-year enhancements for the prior prison terms.[8]

In many cases, when part of a sentence is stricken on review a remand for full resentencing is appropriate so that " 'the trial court can exercise its sentencing discretion *in light of the changed circumstances.*' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893, italics added.) In this case, however, there are no "changed circumstances" with respect to Muro's sentence that would justify a remand for full resentencing. The two one-year enhancements that we order to be stricken in this case were already *stayed*, and the trial court expressed an intent to order the enhancements be "stricken/and or stayed." In light of the fact that Muro's sentence has not changed, we will not remand for full resentencing.

DISPOSITION

This matter is remanded to the trial court with directions to amend the abstract of judgment by striking the imposition and stay of the two one-year terms for Muro's prison priors pursuant to section 667.5, subdivision (b). The trial court shall forward an amended abstract of judgment to the Department

---

[8] Were we not to order that the enhancements be stricken based on the amendment to section 667.5, subdivision (b), another ground exists on which we could order that the enhancements be stricken. It is well-established that when a trial court decides that it would not be in the interest of justice for the defendant to serve the one-year enhancement required under section 667.5, subdivision (b), the trial court should *strike* the enhancement rather than impose and *stay* it. (*People v. Langston* (2004) 33 Cal.4th 1237, 1241; *People v. Bay* (2019) 40 Cal.App.5th 126, 139.) Accordingly, following the trial court's statement that it would order the enhancements be "stricken/and or stayed" because they were "not necessary to add to this rather long term," the proper course of action would have been to reflect in the abstract of judgment that the enhancements had been stricken (by not listing them at all in the abstract of judgment), *not* reflect that they had been stayed.

20

of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


IRION, J.

WE CONCUR:



BENKE, Acting P. J.



GUERRERO, J.