Filed 2/11/25  P. v. Dear CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

|  |  |
|---|---|
| THE PEOPLE, | B327114 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA111435) |
| v. | |
| CLARENCE DEAR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Juan Dominguez, Judge.  Affirmed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jason Tran and Kim Aarons, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Clarence Dear appeals from a judgment of conviction after the jury found him guilty of first degree murder and found true a torture-murder special circumstance. On appeal, Dear contends the trial court should have instructed the jury sua sponte on subjective provocation under CALCRIM No. 522 or, in the alternative, his defense counsel was ineffective for failing to request the instruction. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Prosecution's Case-in-chief*

In December 2015, Dear and Dawn Hensley lived together with their three children: 19-year-old Niguel Hensley, 16-year-old Ezekiel Hensley, and 12-year-old Abijah Hensley.[1]  Around the first week of December, Dear and Dawn got into an argument, and Dear left the house for a few weeks. When Dear returned, he got into another argument with Dawn on December 24. The next day, in the morning, Nigel was in the backyard patio when he heard Dawn ask Dear, " 'Why won't you talk to me?' "  Dear "kind of apologiz[ed]."

Shortly after, the family had breakfast together. Dear went into the garage, and Nigel helped Dawn prepare food for dinner. After preparing the food, Nigel went upstairs to get ready for the rest of the day. Fifteen minutes later he heard a noise that sounded "like somebody was hurt." He went into the garage where he saw Dear holding a crowbar and Dawn on the ground with a cut above her eyebrow. Dawn told Dear, " 'I'm

---

[1]    Because Dawn, Nigel, Ezekiel, and Abijah share the same last name, we will refer to them by their first names to avoid confusion.

sorry,' " and Dear responded something like, " 'No, you're not.' "
Dear then screamed at Nigel, " 'Get out.' "

Nigel helped Dawn stand up. As he did so, Dear shoved
Nigel and shouted at him. Once Nigel got Dawn on her feet, he
guided her to the backyard patio and helped her sit down on a
chair because she was bleeding and feeling dizzy. Dear shouted
at Nigel, " 'You're a man now.' " Nigel responded, " 'I'm your
son. . . . It's me.' "

For a "split second" Dear walked away, and Nigel and
Dawn ran into the house through the glass sliding door. Nigel
closed the door and locked it. Dawn told Nigel to call 911, but he
did not have his phone. They ran into the front yard to get the
neighbors' attention. Nigel screamed, " 'Help, call 911.' "

Nigel then heard a long bang, turned around, and saw the
front door open abruptly. Dear ran out the front door at "full
speed" toward Nigel and Dawn. Dear had a gas can in one hand
and a bat raised over his head in the other. Nigel thought Dear
was going to hit him with the bat, so he tried to run away, but he
stumbled and fell down.

Dear caught up with Dawn, grabbed her, and poured
gasoline all over her head and shirt. Nigel saw "a lot of liquid"
coming out of the gas can and yelled, " 'Stop.' " Nigel tried to pull
Dear off Dawn, but Dear pushed him off. At that point, Nigel
saw a spark of fire near Dear's waist, and Dawn caught on fire.
Nigel "scream[ed] at the top of [his] lungs" for someone to help.

Dawn ran into the street engulfed in flames. She dropped
to the ground and rolled but "then just stopped moving" and came
to a stop next to the family car. Dear opened the trunk of the car,
pulled out sheets of gift wrap, and threw it on Dawn. He kicked

3

her while she was still burning and said, " 'Oh, you're sorry now.' " Dear then walked away.

Meanwhile, a neighbor saw Dawn running across the street on fire. He got a fire extinguisher, ran to the area where Dawn had collapsed, and put out the fire with the extinguisher.

The police and paramedics arrived and found Dawn lying on the street with severe burns on her face, arms, and chest. She did not appear to be breathing and was pronounced dead later that same day.

Dr. Matthew Miller conducted Dawn's autopsy. He noted she had a laceration above her eyebrow and bruising to her scalp on the back of her head, both of which occurred before she died. Her cause of death was a combination of "direct thermal injuries" and inhalation of hot gases and flames.

After the incident, Dear went to his cousin Richard Hawe's house and spent the night in a crawl space under the house. The next morning, he knocked on Hawes's window. Dear was wearing women's pants, a sweater, and a construction hat. While at Hawes's house, he cut off his hair.

Dear told Hawes that he fought with Dawn in the garage and tried to "pull her arm off." Dear said Nigel grabbed Dawn by the other arm, pulled Dawn into the house, and locked the glass door. Dear said he "busted the glass window," got the gas can, and " 'chased [Dawn] down.' " When Dear caught up to Dawn, he poured gas on her and set her on fire.

Dear told Hawes he ran into the park and watched the events unfold from behind the bushes. Afterward, he got clothes from a dumpster and took a bus to Hawes's home. When Hawes asked Dear if he regretted burning Dawn, he said he should have done it sooner because she had been molesting him for the last 10

years.  On December 27, Hawes walked Dear to the bus stop and called the police.

B.    *The Defense's Case*

Dear testified that in the years leading up to 2015, his relationship with Dawn was "rocky."  They accused each other of not being faithful and argued about how to raise the children.

In December 2015, Dear drank alcohol frequently.  Starting on December 21, he drank heavily because he was "trying to drown out [Dawn's] voice."  On December 25, at 2:00 a.m., he went to bed drunk.  He woke up an hour later and discovered that he had soiled himself.  He also felt pain "in [his] backside." He had been having these same physical symptoms for years. This made him angry at Dawn because he believed she had been "doing something strange to [him] in [his] sleep" for years.

Dear stormed out of the bedroom and went to the garage where he continued drinking.  After breakfast, he argued with Dawn and then returned to the garage to drink some more. Dawn came into the garage and yelled, " 'We need to talk.' "

Dear directly asked Dawn if she had been sodomizing him in his sleep.  Dawn admitted to doing so with sleeping pills, food, "poison," and other things.  According to Dear, "that's when [he] lost it."  He yelled at Dawn, " 'Get out,' " and Dawn "lunged" at him.  The two fell to the floor and lost consciousness.

When they woke up, Dear grabbed a lug wrench, swung it in front of Dawn, and asked her, " 'What is wrong with you?' " Around that time, Nigel came into the garage.  Dear told him, " 'You're not supposed to be here. . . .  I'm not ready to have this conversation with you.' "  Nigel "just stood there," and Dear told

5

him, " 'Your mother has been molesting me for over [10] years.' " Dear explained what Dawn had been doing to him.

Once the conversation ended, Nigel and Dawn went into the house, and Nigel locked the glass sliding door.  Dawn stood in front of the glass door and mouthed to Dear, " 'I'm going to fucking kill you.' "

Dear grabbed a can of gasoline and used a bat to break the glass door open.  His intention was "[t]o stop her from doing what she just said."  He ran after Dawn and Nigel as they fled the house toward the street.  Dear poured the gasoline on Dawn and set her on fire with his lighter.  Dawn ran back toward the house and then turned and ran into the street where she collapsed.

Dear opened the trunk of the family car, looking for something to put out the fire.  As he stood in shock, a neighbor came by with an extinguisher and put out the fire.  Dear then ran to an alley, changed his clothes, and hid in the bushes.  He knew he had done "something terrible."

Dear took a bus to Hawe's house.  He told Hawes what he had done, and Hawes advised him to shave his head.  The next morning, he took a bus to Santa Monica to find a lawyer and was arrested on the bus.

During cross-examination, Dear admitted that between December 4 and December 21, when Dear was away from the house, Dawn sent him several text messages.  On December 8, Dawn wrote, " 'Hey, will you be home for dinner?  I'm getting chicken.' "  Dear did not respond.  On December 9, she wrote, " 'Hello, Daddy.  I was supposed [sic] talking about things I'm going through.  I wanted to say I hope [you] feel better."  Dear did not respond.

6

On December 10, Dawn wrote in capital letters, " 'Hello. I apologize that my message came off passive aggressive. That is not what [I] meant at all. I don't want to start an argument either, love. So here is the simple question. . . . Are you coming home?' " Dear responded five minutes later, " 'In class. Can't talk.' " Dawn wrote, " 'Sorry,' " and Dear responded, " 'ok.' " Dawn then wrote, " 'Okie dokie. The one who has all my love, my man. When are you coming back to me[!!]' " She added, " 'Do you even want to come back to me?' "

On December 11, Dear sent a text message to Dawn stating, " 'Are you hard of hearing? You make sure that ass is clean and in the air when I get there. Okey?' " Dawn responded, " 'Are you on your way? . . . I need to know when you're coming." Dawn later wrote, " 'Hello,' " and Dear responded, " 'Do what you do. Can't talk.' "

On December 12, Dawn wrote, " 'Hello. Can you talk now[?] . . . [W]hy are you doing all this?' " Dear did not respond. Five days later, she wrote, " 'Good day to you. I know you're busy and can't talk. . . . Wish you were here. . . . Do you think you'll be home for Christmas?' " Dear did not respond. Two days later, Dawn wrote, " 'I can't wait for you to come home and kiss me from head to toe while making sweet love under the Christmas tree.' " Dear responded, " 'Be home for Xmas. I thought I sent this when I wrote it. I get you.' "

C.      *The Prosecution's Rebuttal*

Abijah testified that Dear never appeared to be drunk on December 24 or before attacking Dawn on December 25.

Nigel testified that Dear did not appear to be drunk on December 25. He also testified that Dear's version of what

7

happened in the garage was not true: Dear did not tell Nigel that Dawn had been molesting Dear. Instead, Dear shoved and screamed at Nigel while Nigel tried to help Dawn get off the floor. Nigel further testified that when he and Dawn went inside the house through the glass door, Dawn did not mouth to Dear that she was going to kill him.

D.     *Charges, Verdicts, and Sentence*

The People charged Dear with murder (count 1, Pen. Code, § 187, subd. (a))[2] and endangering the health of the child Abijah (count 2, § 273a, subd. (b)). The People also alleged a special circumstance that the murder was intentional and involved the infliction of torture. (§ 190.2, subd. (a)(18).)

The jury found Dear guilty of first degree murder and found true the torture-murder special circumstance. The jury was unable to reach a verdict as to count 2 for endangering the health of a child, and the court declared a mistrial as to that count and dismissed it. The court sentenced Dear to life in prison without the possibility of parole for the special circumstance murder.

Dear timely appealed.

## DISCUSSION

Dear argues the trial court erred by not instructing the jury sua sponte on subjective provocation under CALCRIM No. 522. In the alternative, he argues his defense counsel provided ineffective assistance of counsel by not requesting the instruction. We reject both his arguments.

_____

[2]     Undesignated statutory references are to the Penal Code.

A. *Relevant Background*

    1. *Jury instructions*

During a conference regarding jury instructions, defense counsel requested the trial court instruct the jurors with CALCRIM No. 570 on voluntary manslaughter under a heat of passion theory. Defense counsel did not request an instruction on CALCRIM No. 522. The prosecution argued that in addition to CALCRIM No. 570, the trial court should instruct the jurors with CALCRIM No. 571, the instruction on imperfect self-defense. Defense counsel did not object. Accordingly, the trial court instructed the jurors with CALCRIM Nos. 520 (first or second degree murder), 521 (first degree murder), 570 (voluntary manslaughter: heat of passion), and 571 (voluntary manslaughter: imperfect self-defense).

As relevant here, CALCRIM No. 520 provided: "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM 521."

CALCRIM No. 521 provided, in relevant part: "The defendant is guilty of first-degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. . . . A decision to kill made rationally, impulsively, or without careful consideration is not deliberate and premeditated. . . . The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first-degree murder."

9

CALCRIM No. 570 provided, in relevant part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

2.     *Closing argument*

During closing, defense counsel conceded that Dear intentionally killed Dawn. Defense counsel stated, "The question then . . . is [w]hat level of homicide will you, as the jury, decide upon at the end of your deliberations?" Counsel told the jury, "I'm going to ask you to . . . find that . . . Dear is guilty only of a voluntary manslaughter under a theory of . . . heat of passion." In describing the heat of passion theory, defense counsel stated, "What I'm saying here is that this is, in many ways, a subjective standard. . . . [I]t doesn't matter if it actually happened. . . . It doesn't matter that this is nonsense."

Defense counsel repeated several times that voluntary manslaughter under a heat of passion theory was his primary defense. He stated, "And, once again, I am focusing on heat of passion. I'm asking you to consider all the evidence presented and find that there was provocation. I'm asking you to find that, as a result of that provocation, . . . Dear acted . . . rationally [sic] and under the influence of intense emotions . . . and that that provocation would have caused a person of average disposition to

10

similarly act . . . . So, please, just—when you deliberate . . . please focus on that aspect at this point in the case." Later, he said, "So, as I said, I'm hoping that you consider the evidence and you make a finding that . . . Dear committed a voluntary manslaughter."

At the end of his closing, defense counsel explained, "If you do find that this level of provocation was insufficient . . . then, yes, he's guilty of a level of murder. However, . . . the evidence fully supports . . . that he was acting irrationally and emotionally, and if you do make that finding, then you find that this was murder in the second degree; that it was not premeditated and deliberated."

B.    *The Trial Court Did Not Have a Sua Sponte Duty To Instruct on CALCRIM No. 522*

Dear argues that although defense counsel did not request CALCRIM No. 522, "the trial court should have given the additional instruction sua sponte to clarify that the provocation necessary to reduce first degree murder to second degree murder is judged by a subjective standard." We reject his argument.

CALCRIM No. 522 provides: "Provocation may reduce a murder from first degree to second degree. . . . The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

This instruction is based on the principle that " 'provocation which is not "adequate" to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and

11

carried it out after, deliberation and premeditation.' " (*People v. Wickersham* (1982) 32 Cal.3d 307, 329, overruled on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 200-201.) "If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)

In *People v. Rivera* (2019) 7 Cal.5th 306 (*Rivera*), the defendant relied on the same argument that Dear makes here. (*Id.* at p. 328 ["Rivera contends that the trial court committed prejudicial error when it failed to sua sponte instruct the jury [with CALCRIM No. 522 or CALJIC No. 8.73] that subjective provocation can reduce premeditated murder to second degree murder in this case"].) The Supreme Court concluded: "[A]n instruction that provocation may be sufficient to raise reasonable doubt about premeditation or deliberation, such as CALJIC No. 8.73 or CALCRIM No. 522, is a pinpoint instruction to which a defendant is entitled only upon request where evidence supports the theory. [Citation.] The trial court is not required to give such an instruction sua sponte." (*Id.*, at pp. 328-329, citing *People v. Rogers* (2006) 39 Cal.4th 826, 877-880 (*Rogers*) ["Because CALJIC No. 8.73 relates the evidence of provocation to the specific legal issue of premeditation and deliberation, it is a 'pinpoint instruction' . . . and need not be given on the court's own motion"].)

We are bound by our Supreme Court's holdings in *Rivera* and *Rogers*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["[c]ourts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction"].) Dear

was required to request CALCRIM No. 522 if he wished it to be given to the jury, and his failure to do so waives any claim of error on appeal.

C. *Defense Counsel Did Not Provide Ineffective Assistance of Counsel*

Dear argues in the alternative that defense counsel was ineffective for failing to request a pinpoint instruction on CALCRIM No. 522 because "counsel could have no tactical reason for not requesting the court to instruct with CALCRIM No. 522" and the failure to instruct was prejudicial. His argument is without merit.

To demonstrate ineffective assistance of counsel, Dear must show (1) his counsel's performance fell below an objective standard of reasonableness, and (2) but for counsel's error, a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

1. *Dear has not met his burden to show defense counsel's performance was deficient*

"Because of the difficulties inherent in making the evaluation [of counsel's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland v. Washington*, *supra*, 466 U.S. at p. 689.) "His burden in this regard 'is difficult to carry' in this case, because this is a direct appeal and the record does not

13

disclose the reason" for his counsel's conduct. (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.) Reversal is permitted " 'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*Ibid*.)

Dear has failed to carry his burden because defense counsel was not asked why he failed to object, the record does not affirmatively disclose that counsel had no rational tactical purpose for the omission, and we are not convinced there could be no satisfactory explanation. Defense counsel could have declined to request CALCRIM No. 522 because it did not advance the defense's primary theory of the case—that Dear was guilty of voluntary manslaughter based on heat of passion. Additional jury instructions on provocation as a basis for second degree murder under CALCRIM No. 522 would have instead focused the jury's attention on second degree murder. It could have been a tactical decision for defense counsel to focus the jury's attention on voluntary manslaughter, instead of second degree murder, because it carries a lower sentence.[3] (Cf. *People v. Thomas* (1992) 2 Cal.4th 489, 531-532 [defense counsel's "[f]ailure to argue an alternative theory is not objectively unreasonable as a matter of law. . . . That the two [possible defense theories] are not absolutely incompatible does not vitiate a choice to [argue] one or the other"].) Thus, Dear's claim of ineffective assistance of counsel fails.

---

[3] A defendant convicted of second degree murder must serve a sentence of 15 years to life. (§ 190, subd. (a).) By contrast, voluntary manslaughter is punishable by imprisonment for three, six, or 11 years. (§ 193, subd. (a).)

### 2. *Dear was not prejudiced*

Even if defense counsel's performance was deficient, Dear has also failed to establish prejudice. As noted, CALCRIM No. 522 would have instructed the jury that "[p]rovocation may reduce a murder from first degree to second degree" and "[t]he weight and significance of the provocation, if any, are for you to decide." Despite the absence of this instruction, the jury was adequately instructed on these underlying principles.

The trial court instructed the jury on provocation with CALCRIM No. 570: provocation occurs when the defendant acts "rashly and under the influence of intense emotion that obscured his reasoning or judgment." The trial court also instructed the jury on the People's burden of proving first and second degree murder. (CALCRIM Nos. 520 & 521.) The court told the jury that to be guilty of first degree murder, the People must prove the defendant acted willfully, deliberately, and with premeditation. (CALCRIM No. 521.) Although jurors were not expressly instructed on subjective provocation, they were told that, "[a] decision to kill made rationally, impulsively, or without careful consideration is not deliberate and premeditated." (CALCRIM No. 521.) These instructions, taken together, adequately conveyed that a decision based on provocation (made rashly, impulsively, or without careful consideration) could negate a defendant's ability to premeditate and deliberate, and thereby reduce first degree murder to second degree murder. (See *Rogers*, *supra*, 39 Cal.4th at p. 880 [instruction on heat-of-passion voluntary manslaughter is not misleading without CALJIC No. 8.73, the analogue to CALCRIM No. 522, "because the jury is told that premeditation and deliberation is the factor distinguishing first and second degree murder"].) Further, the

15

instructions the court gave "d[id] not preclude the defense from arguing that provocation played a role in preventing the defendant from premeditating and deliberating; nor d[id] it preclude the jury from giving weight to any evidence of provocation in determining whether premeditation existed." (*Rogers*, at p. 880.) Indeed, defense counsel argued to the jury, as part of his secondary theory of the case, that the jury could find Dear guilty of second degree murder if it found "he was acting irrationally and emotionally." Dear has not shown he was prejudiced by his counsel's failure to request CALCRIM No. 522.

Moreover, had the trial court instructed the jury with CALCRIM No. 522, a different result would not have been reasonably probable because there was overwhelming evidence of first degree murder. Murder that is perpetrated by a "willful, deliberate, and premeditated killing" is first degree murder. (§ 189, subd. (a).) " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.] The reflection may be arrived at quickly; it need not span a specific or extended period of time. [Citation.] We have found planning activity, preexisting motive, and manner of killing to be relevant, although these factors do not ' "exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation." ' " (*People v. Lopez* (2018) 5 Cal.5th 339, 354-355; see *People v. Cole* (2004) 33 Cal.4th 1158, 1225 ["a cold and calculating decision to kill can be arrived at very quickly"].)

Here, the manner of killing overwhelmingly demonstrated "cold, calculated judgment" by Dear. (*People v. Solomon* (2010) 49 Cal.4th 792, 812 (cleaned up).) "[T]he evidence showed that

[Dear's] act's occurred in stages." (*People v. Streeter* (2012) 54 Cal.4th 205, 244 [manner of killing demonstrated premeditation and deliberation where succession of events included defendant beating victim, stopping to retrieve gasoline, pouring gasoline on victim, dragging her to car, retrieving lighter, and then chasing victim and setting her on fire].) Dear beat Dawn's face with a crowbar. When Nigel caught him in the act and removed Dawn from his grip, Dear put up a fight, shoving and shouting at Nigel. And when Nigel and Dawn fled inside the house and locked Dear out, Dear retrieved a can of gasoline and a bat. He then used the bat to break through the locked glass door. He chased after Dawn, poured the entire can of gasoline on her, and set her on fire. As Dawn burned, he threw wrapping paper on her, kicked her, and said, " 'Oh, you're sorry now.' " Thus, Dear "had many opportunities to consider and reflect on his actions, but chose to continue with his plan to set [Dawn] on fire and kill her." (*Ibid.*; see *People v. Cole, supra*, 33 Cal.4th at p. 1225 [record contained evidence of "deliberate manner of killing" to support first degree murder conviction where defendant poured flammable liquid on victim while she was asleep, ignited it after she awoke, and said to victim, " '[I] hope you fuckin burn to death' "].)

There was also plentiful evidence that Dear had a preexisting motive to kill Dawn. Dear admitted he and Dawn had a "rocky" relationship and a history of arguing. (See *People v. Anderson* (1968) 70 Cal.2d 15, 27 ["defendant's [p]rior relationship and/or conduct with the victim" can "support an inference that the killing was the result of 'a pre-existing reflection' "].) In the weeks preceding the killing, Dear and Dawn had an argument, and Dear left the house for several weeks.

During the time Dear was gone, Dawn texted him multiple times to ask when he would come home.  Dear either ignored her messages or sent curt, non-responsive answers, such as " 'Can't talk,' " indicating he was angry with Dawn.  When Dear finally returned home, the evidence showed he still harbored anger toward her.  He admitted he drank heavily in the days leading up to the murder "to drown out [Dawn's] voice."  And, hours before the murder, Nigel witnessed the simmering tension between his parents when Dawn asked Dear, " 'Why won't you talk to me?' "  Given the ample evidence of Dear's preexisting motive and cold, calculated manner of killing, there was no reasonable probability the jury would have found Dear guilty of second degree murder if the trial court had instructed it with CALCRIM No. 522.

## DISPOSITION

The judgment is affirmed.

STONE, J.

We concur:

SEGAL, Acting P. J.

FEUER, J.

18